**ACE** ///////

## ASSOCIATED CREDITORS EXCHANGE, INC.
P. O. BOX 33130
PHOENIX, AZ 85067-3313

Exhibit" 1

|  |  |
|---|---|
| Date: | March 12 2009 |
| Client: | U. S. BANK |
| File: | 070044-9 |
| Client Acct. #: | 4761538863640934 |
| **Total Due:** | **$8,417.00** |

070044-9 * 1 011     14874 - 562
DAIRY QUEEN
KEVIN SCHEUNEMANN
210 DREAM CATCHER DR
KEWASKUM WI  53040-9342

Mail to:
ASSOCIATED CREDITORS EXCHANGE, INC.
P. O. BOX 33130
PHOENIX, AZ 85067-3130

⊱ Cut Coupon Above & Return With Your Payment ⊰

A claim has been placed with our firm, Associated Creditors Exchange, Inc., in the amount of $8,417.00.

Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days from receiving this notice, this office will: obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you request this office in writing within 30 days after receiving this notice, this office will provide you with the name and address of the original creditor, if different from the current creditor.

Note: When making your payment, please indicate your file number located above.

Sincerely,

ANGIE HERNANDEZ

This is an attempt to collect a debt and any information obtained will be used for that purpose.
Pursuant to 15 U.S.C. §1692E(11), please be advised that this communication is from a debt collector.

Our web site address is: www.ace-collects.com.

Mon-Tue: 8:00 am - 7:00 pm  Wed-Thu: 6:30 am - 5:00 pm
Fri: 6:00 am - 3:00 pm

ASSOCIATED CREDITORS EXCHANGE, INC. ◆ 3443 N CENTRAL AVE SUITE 1100 ◆ PHOENIX, AZ 85012
P. O. BOX 33130 ◆ PHOENIX, AZ 85067-3313

**ACE**

**ASSOCIATED CREDITORS EXCHANGE, INC.**
P. O. BOX 33130
PHOENIX, AZ 85067-3313

Exhibit 2

Date: March 13 2009
File: 070044-9
Client: U. S. BANK
Client Acct. #: 4761538863640934
Total Due: $8418.66

070044-9 * 1 055          14874 - 592
DAIRY QUEEN
KEVIN SCHEUNEMANN
210 DREAM CATCHER DR
KEWASKUM WI  53040-9342

Mail to:
ASSOCIATED CREDITORS EXCHANGE, INC.
P.O. BOX 33130
PHOENIX, AZ 85067-3130

---

✂ **Cut Coupon Above & Return With Your Payment** ✂

This will confirm our most recent conversation wherein you agreed to remit payment in full for the above listed balance upon receipt of this letter.

If you have any questions, please do not hesitate to contact me at the telephone number listed below. Otherwise, we will look forward to receiving payment in accordance with our agreement.

Thank you for your cooperation in this matter.

055

**Note:** Please indicate your file number on the remittance. Return the top portion of this letter to insure proper credit to your account.

Sincerely,

ANGIE HERNANDEZ

This is an attempt to collect a debt and any information obtained will be used for that purpose.
Pursuant to 15 U.S.C. §1692E(11), please be advised that this communication is from a debt collector.
Our web site address is: www.ace-collects.com.

Mon-Tue: 8:00 am - 7:00 pm, Wed-Thu: 6:30 am - 5:00 pm
Fri: 6:00 am - 3:00 pm
ASSOCIATED CREDITORS EXCHANGE, INC.  ♦  3443 N CENTRAL AVE SUITE 1100  ♦  PHOENIX, AZ 85012
P. O. BOX 33130  ♦  PHOENIX, AZ 85067-3130
(800)-280-3800  ♦  (602)-222-2400

14874 - 592 - 055

Kevin Scheunemann
210 Dream Catcher Dr.
Kewaskum, WI 53040

Exhibit 3 1

3/22/09

Associated Creditors Exchange, Inc.
PO Box 33130
Phoenix, AZ 85067-3313

Re: 070044-9   (alleged US Bank account)

To whom it may concern;

Be advised that this is a refusal to pay, and a notice sent pursuant to the
Fair Debt Collection Practices Act, 15 USC 1692g Sec. 809 (b) that your claim
is disputed and validation is requested.

This is NOT a request for "verification" or proof of my mailing address, but a
request for VALIDATION made pursuant to the above named Title and Section. I
respectfully request that your offices provide me with competent evidence that
I have any legal obligation to pay you.

Please provide me with the following:

1.) What the money you claim I owe;
2.) Explain and show me how you calculated that amount; including copies all statements
incurring the charges. Please produce the account and general ledger statement showing
the full accounting of the alleged obligation that you are now attempting to collect.
3.) Please furnish a copy of the original promissory note redacting my social
security number to prevent identify theft and state under penalty of perjury that your
client is the holder in due course of the promissory note and will produce the original
for my own and a judge's inspection should there be a trial to contest these matters.
4.) Please identify by name and address all persons, corporations, associations, or any
other parties having an interest in legal proceedings regarding the alleged debt.
5.) Please verify under penalty of perjury, that as a debt collector, you have not
purchased evidence of debt and are proceeding with collection activity in the name of the
original maker of the note.
6.)   Please verify under penalty of perjury that you know and understand that credit card
contracts are a series of continuing offers to contract and as such are nontransferable.
7.)  Please provide verification from the stated creditor that you are authorized to act
for them.
8.) Please verify that you know and understand that contacting me again after
receipt of this notice without providing procedurally proper validation of the debt
constitutes the use of interstate communications in a scheme of fraud by advancing a
writing, which you know is false with the intention that others rely on the written
communication to their detriment.
9.) Prove the Statute of Limitations has not expired on this account;
10.) Show me that you are licensed to collect in my state;
11.) Provide me with your license numbers and Registered Agent;
12.) Indicate whether this debt has been assigned or purchased by you;
13.) Provide copies of the purchase agreement or assignment in #12 between your firm and
the original creditor.

**THE WISCONSIN CONSUMER ACT, WISCONSIN STATUE, CHAPTER 422 & 425, ALSO
ENTITLES ME TO ALL THIS INFORMATION BEFORE YOUR ORGANIZATION CAN HOLD
ME LIABLE FOR AN ALLEGED CONSUMER DEBT IN WISCONSIN.**

**If the alleged agreement has any arbitration clause that waives your litigation rights
over this alleged debt, we hereby invoke it.**

All of these validation items are required to be provided at no charge.

At this time I will also inform you that if your offices have reported invalidated
information to any of the 3 major Credit Bureau's (Equifax, Experian or TransUnion) this

action might constitute fraud under both Federal and State Laws. Due to this fact, if any negative mark is found on any of my credit reports by your company or the company that you represent I will not hesitate in bringing legal action against you for the following:

Violation of the Fair Credit Reporting Act
Violation of the Fair Debt Collection Practices Act
Defamation of Character
If your offices are able to provide the proper documentation as requested in the following Declaration, I will require at least 30 days to investigate this information and during such time all collection activity must cease and desist.

Also during this validation period, if any action is taken which could be considered detrimental to any of my credit reports, I will consult with my legal counsel for suit. This includes any listing any information to a credit reporting repository that could be inaccurate or invalidated or verifying an account as accurate when in fact there is no provided proof that it is.

If your offices fail to respond to this validation request within 30 days from the date of your receipt, all references to this account must be deleted and completely removed from my credit file and a copy of such deletion request shall be sent to me immediately.

I would also like to request, in writing, that no telephone contact be made by your offices to my home or to my place of employment. If your offices attempt telephone communication with me, including but not limited to computer generated calls and calls or correspondence sent to or with any third parties, it will be considered harassment and I will have no choice but to file suit. All future communications with me MUST be done in writing and sent to the address noted in this letter by USPS.

Our personal information has also been compromised by the State of WI and 3rd party fraud may have occurred on any alleged account you claim.

If you feel the FDCPA does not apply then read the following:

## Please be advised that we dispute the claimed debt(s) described above.

Please provide any contract or agreement we signed and an account history showing how you arrived at the conclusion that we owe the amounts claimed and when this alleged debt(s) was charged off.

Furthermore, you are hereby requested, as required by the Uniform Commercial Code, to provide copies of assignments and other documents showing that you or your principal is in fact the assignee of the debt(s) described above and that you are legally authorized to attempt to collect the claimed debt(s) from us.

Unless and until such proof is furnished, we do not recognize any right on your part to attempt to collect any amount from us through any means whatever, including credit reporting. We refuse to pay any debt which has not been substantiated in the manner we request and direct you to cease further communications unless and until you can provide such substantiation.

Until all of the requested information is provided above, because I do not know who you are or what you are talking about,

I DISPUTE!

Thank you,


Kevin Scheunemann

Kevin Scheunemann
210 Dream Catcher Dr.
Kewaskum, WI 53040

Exhibit 4

3/22/09

Associated Creditors Exchange, Inc.
PO Box 33130
Phoenix, AZ 85067-3313

Re: 070044-9   (alleged US Bank account)

Attn: Angie Hernandez

I am in receipt of your fraudulent and FDCPA, FCRA, and Wisconsin Consumer Act
(WCA) violating correspondence of 3/13/09.

If you truly taped the phone call we had, you will have no problem producing it
for the court to prove your fraudulent 3/13/09 assertion in your letter.

Since we both know your organization committed no less than 5 violations of my
consumer rights, you will not produce, or worse, destroy the phone tape.

I hereby demand you produce the written agreement you reference in your
3/13/09.   Failure to produce any such agreement in 30 days will force me to
file suit over your company's violations.


Thank you,


Kevin Scheunemann

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**Kevin Scheunemann,**
              **Plaintiff,**          Court File No.: 2:09-cv-1134

**v.**

**Associated Creditors Exchange, Inc. aka ACE,**
              **Defendant.**

---

# Affidavit of Kevin Scheunemann

I, Kevin Scheunemann, of age and competent to testify, state as follows based on my own personal knowledge:

1.)      I am an adult resident in Kewaskum, Wisconsin. I reside at 210 Dream Catcher Dr. Kewaskum, WI.

2.)      I am a "consumer" and "customer" for purposes of the Fair Debt Collections Practices Act (FDCPA) and the Wisconsin Consumer Act, as defined by 15 U.S.C. § 1692a(3) & Wis. Stat. § 421.301 (17).

3.)      Associated Creditors Exchange ("ACE") and Angie Hernandez ("Hernandez") represented to me that they are "debt collectors" in their letters to me, on several occasions, under Wis. Stat. § 427.103 (3) and 15 USC § 1692 E(11). Angie Hernandez represented this was a consumer debt to me under the FDCPA by stating, "This is an attempt to collect a debt and any information will be used for that purpose. Pursuant to 15 U.S.C. § 1692 E(11), please be advised that this is a communication from a debt collector." Exhibit #1 and #2.

4.)      I believe the underlying debt and transactions on the account listed in Exhibit #1 and #2 were primarily used for personal, household, and family purposes.

5.)      ACE and Angie Hernandez engaged in the practice of "debt collection" to me, on several occasions, under Wis. Stat. § 427.103 (2). ACE also made

representations to me that I understood them to be a "merchant" under Wis. Stat. § 421.301 (25).

6.)     ACE left a message for me to call the Defendant.   I returned the phone call on 3/13/2009.   I started out by speaking to Angie Hernandez.

7.)     Hernandez represented to me she was working for ACE, the Defendant in this lawsuit.

**8.)**     Hernandez began to talk about the U.S. Bank consumer claim.   I interjected and asked if she had sent the FDCPA required "dunning notice" over the claim. Hernandez explained that notice was sent on 3/12/09.   **AT NO TIME DID HERNANDEZ OBJECT TO THE FDCPA APPLYING TO THE CLAIM.**

**9.)**     I then indicated we had nothing to talk about until I receive that notice and exercise my 30-day validation and verification rights under the FDCPA.   I also indicated I would be disputing this debt and exercising my rights under the Wisconsin Consumer Act (WCA) for complete documentation of the claim.   **AT NO TIME DID HERNANDEZ OBJECT TO THE WCA APPLYING TO THE CLAIM**

10.)     Hernandez then asked me if I knew anything about the FDCPA.   I indicated I did understand the FDCPA.   Hernandez than indicated the FDCPA does not give me the right to demand documentation of the claim.   I indicated and re-clarified for Hernandez that I was demanding documentation under the WCA, not the FDCPA.

11.)     Hernandez put me in a "quasi-hold" state in this phone call.   I heard Hernandez yell, "he's demanding FDCPA rights."

12.)     Hernandez than exited the call and an unidentified female supervisor ("Jane Doe") for ACE started talking with me on the phone.   Jane Doe asked me, "why

can't you just pay this bill?" I replied, "because I have no idea who you are and what you are talking about."

13.)  Jane Doe, female supervisor for ACE, then called me a "thief", and a "liar". I was shocked and dismayed by this comment.

14.)  After getting over my shock, I informed Jane Doe from ACE, she is not allowed to say that under state and federal law.

15.)  Jane Doe from ACE then rudely cut me off and shouted that she and ACE did not have to adhere to state law.

16.)  I indicated, "Let's get a state court jury to decide that. Can I get a copy of this phone call recording?"

17.)  Jane Doe, female supervisor for ACE then indicated I was "ignorant" and that I could not get a jury for this issue.

18.)  After getting over my shock and dismay, I again explained that federal and state debt collection law does not allow you to say that.

19.)  Jane Doe, female supervisor from ACE then gave the phone to an unidentified male supervisor from ACE. ("John Doe")

20.)  Immediately, John Doe, male supervisor from ACE, accused me of "fraud" and "criminal activity". I was again shocked and dismayed and recall becoming emotionally numb to the mob-like collection tactics.

21.)  I again explained federal and state law does not allow for those kind of collection tactics.

22.)    Immediately, John Doe, male supervisor from ACE, cut me off.   John Doe threatened to immediately add to my public records on my credit report.  I took this to mean false and made up court judgments and other false derogatory credit entries made by this ACE supervisor.

23.)        I explained the public record on my credit report is on appeal and that I did not agree with the judgment.

24.)        John Doe, male supervisor from ACE then told me I was "stupid" and that I "can't appeal a civil judgment".

25.)        I was shocked, confused, and distressed.   I immediately feared for my safety and my family's safety because I firmly believed this ACE supervisor was capable of anything.

26.)        I asked if he would like to explain his last statement to the 3-judge panel in the Wisconsin 2nd District Court of Appeals.   John Doe hung up the phone.

27.)        I spent weeks worrying about what ACE employees were going to do to me, I explained to them 3 times they were violating the law and they kept right on violating the law.  I feared ACE, and its employees, were willing to violate and break any law.   I worried about derogatory credit entries, harassing phone calls, unlawful letters, and an ACE employee showing up at my house doing harm to me, my wife, and our children.

28.)        I believe ACE employees were attempting to give me legal advice.

29.)        I received Exhibit #1 from Angie Hernandez on 3/20/10, 3 days after the 5-day FDCPA requirement.   Hernandez indicated she was a "debt collector" under the FDCPA and also referred to section 15 USC § 1692E(11) in

her letter.   AT NO TIME DID HERNANDEZ OR ACE MAKE REFERENCE TO
THIS BEING A COMMERCIAL CLAIM.

30.)        Hernandez also wrote to me in Exhibit #2.   I received this letter
also on 3/20/10.  Hernandez again asserted she was a "debt collector" under the
FDCPA.   Hernandez also stated, "This will confirm our most recent conversation
wherein you agreed to remit payment in full for the above listed balance upon
receipt of this letter."   **I did not agree, at any time, to make payment during
the phone conversation Hernandez claimed in this letter.**  I consider this
letter to be false, untrue, and deceptive.  I consider Hernandez to be a liar.

31.)        I mailed Exhibits #3 and #4 on 3/22/10 to assert my rights under the
FDCPA and WCA.   ACE refused to document their alleged claim.

32.)        As a result of ACE's actions, I was forced to abandon a large asset.

33.)        In January 2003, Scheunemann entered into a business deal to sell
the Dairy Queen in Belgium, Wisconsin.   This transaction included carrying a
$120,000, interest payment only, promissory note from the buyer, at the stated
interest rate.   The note included taking a second lien filing on the assets of the
business.

34.)        On 1/1/08 the promissory note due to me was defaulted on.  This note
was secured by the underlying assets of the "Dairy Queen" business in Belgium, WI.
I attempted several work out agreements with the maker of the note over the next 20
months.   None of those ideas worked out.  The solution to the default was for me to
assume and take the business assets back and take over the business.   This
solution needed American Dairy Queen (ADQ) transfer approval.  I feared pursuing
this option because of my obligation, under the ADQ transfer rules, to disclose ACE
and their employee's deceptive letters sent to me in March 2009.   As a result of
ACE and their employee's misleading, false, and untrue representations, I chose not
to pursue the ADQ transfer option, fearing disclosure of the thuggish ACE employee

representations would have repercussions for my existing Dairy Queen business in Kewaskum with ADQ.   (Exhibit #6)

35.)        As a result of my fear generated by ACE's untrue representations to me under Wis. Stat. § 101.18, WCA, and the FDCPA, I reasonably chose not to pursue ADQ transfer.  The entire business in Belgium, WI ended up closing. Had I been able to transfer and secure the business back, with ADQ transfer permission, I could have retained the entire defaulted note and business equity I lost.   The business would be open today.  Instead, I lost the entire $120,000 note, plus interest since 1/1/08, and any future business profit that may have resulted from the ADQ transfer.  (Exhibit #6)

36.)        As a result of ACE's actions, I have been socially, emotionally, and financially damaged.

37.)        I have never had any prior or present contractual relationship with ACE.  I never intended to enter into any express or implied contractual relationship with ACE.

Dated _5\3\_ , 2010

_[signature]_

**Kevin Scheunemann**
**210 Dream Catcher Dr.**
**Kewaskum, WI 53040**
kewaskumdq@verizon.net
**262-339-5425**


**STATE OF WISCONSIN INDIVIDUAL ACKNOWLEDGMENT**

**COUNTY OF** _Washington_

Before me, the undersigned, a Notary Public in and for said County and State on

this _3_ day of _May,_ 2010, personally appeared _Kevin Scheunemann_

to me known to be the identical person who executed the within and foregoing instrument

and acknowledged to me that he executed the same as his free and voluntary act.

Given under my hand and seal the day and year last above written.

My commission expires _3-13-11_

_Kristy Vogt_ ———— **Notary Public**

## Certificate of service

I, Kevin Scheunemann, certify that _____, 2010, I mailed
a true and correct copy of the above summary judgment affidavit to:
ACE's legal counsel.

Kevin Scheunemann

Please send a copy of all notices and correspondence to:

Kevin Scheunemann
210 Dream Catcher Dr.
Kewaskum, WI 53040

Ex. #6

# PROMISSORY NOTE

January 7, 2003

$120,000.00

Seven (7) years after January 7, 2003, the undersigned promises to pay to the order of **TRUE Q ENTERPRISES, INC.**, or its assigns, the sum of One Hundred Twenty Thousand and no/100 Dollars ($120,000.00) with interest at the rate of six and one-half percent (6.5%) per annum, payable monthly in the amount of Six Hundred Fifty and no/100 Dollars ($650.00) with the first payment due February 7, 2003, and the seventh day of each month thereafter.

This Note shall be secured by all of the undersigned's business assets for its Dairy Queen/Brazier store located at 107 Lakeview Drive, Belgium, Wisconsin, including all fixtures, equipment, supplies, intangibles and franchise agreements. The undersigned will sign UCC financing statements and security agreements to evidence such collateral. This Note is subordinate to any notes Hometown Bank, or any other lender that refinances such notes, holds on the above mentioned property.

Principal or interest that is not paid when due to draw interest at the rate of twelve percent (12%) per annum, or the current adjusted interest rate, whichever is higher.

The undersigned shall have the right of full or partial prepayment at any time without penalty.

If default be made in any payment of this note the entire principal sum and accrued interest shall at once become due and payable without notice, at the option of the holder of this Note. Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. In the event of default in the payment of this Note, and if the same is collected by an attorney at law, the undersigned hereby agrees to pay all costs of collection, including a reasonable attorney's fees.

A reduction in principal will reduce the interest payment based on the remaining debt outstanding. The undersigned will have the right to pay Nine Thousand Five Hundred and no/100 Dollars ($9500.00) in principal every January 7th during the first five (5) years of this note and receive an extra Five Hundred and no/100 Dollars ($500.00) credit from True Q Enterprises, Inc. on the reduction of debt principal of this note. This credit is limited to Two Thousand Five Hundred and no/100 Dollars ($2500.00) over the life of this note. All credits will be voided if Hometown Bank or its assigns objects to any principal payments made before maturity.

At maturity, the undersigned may exercise an option to extend the remaining principal payment for three (3) years at ten percent (10%) interest only, payable monthly, with full principal payment due January 7, 2013. This Note may be amended at maturity (January 7, 2010) by mutual consent of the undersigned and True Q Enterprises, Inc.

Through December 31, 2003, HDQ, LLC shall have the right to offset against any amounts due pursuant to this Note any amounts owed to HDQ, LLC by True Q Enterprises, Inc. arising out of the any breach by True Q Enterprises, Inc. of the Asset Purchase Agreement between the parties.

**HDQ, LLC**

By: _____
Randy Haeuser, Member

By: _____
Jaclyn Haeuser, Member

**SECURITY INTEREST SUBORDINATION AGREEMENT**



The undersigned has or may acquire a security or other interest in the following described property ("Collateral") HDO, LLC

_____ ("Debtor"):

ALL EQUIPMENT, FIXTURES, INVENTORY, DOCUMENTS, GENERAL INTANGIBLES, ACCOUNTS, DEPOSIT ACCOUNTS (UNLESS A SECURITY INTEREST WOULD RENDER A NONTAXABLE ACCOUNT TAXABLE) CONTRACT RIGHTS, CHATTEL PAPER, INSTRUMENTS, LETTER OF CREDIT RIGHTS AND INVESTMENT PROPERTY, NOW OWNED OR HEREAFTER ACQUIRED BY DEBTOR (OR BY DEBTOR WITH SPOUSE), AND ALL ADDITIONS AND ACCESSIONS TO, ALL SPARE AND REPAIR PARTS, SPECIAL TOOLS, EQUIPMENT AND REPLACEMENTS FOR, SOFTWARE USED IN, ALL RETURNED OR REPOSSESSED GOODS THE SALE OF WHICH GAVE RISE TO AND ALL PROCEEDS, SUPPORTING OBLIGATIONS, AND PRODUCTS OF THE FOREGOING, WHEREVER LOCATED.

and the undersigned understand(s) that HOMETOWN BANK, 1200 MAIN, PO BOX 107, ST. CLOUD, WI

_____ ("Lender")

53079

has or may acquire a security interest in the Collateral. In consideration of the Lender's extension of credit or any other financial accomodation to Debtor at any time (by forbearance of collection or otherwise), the undersigned agree(s):

1. All interest of the undersigned in the Collateral, whether now or hereafter acquired, shall be subordinate and junior to Lender's interest in it with the same effect as if Lender had perfected its interest in the Collateral before the undersigned perfected its interest.

2. The undersigned shall be entitled to enforce all claims of the undersigned against Debtor as a general creditor, and Lender's claims against Debtor as a general creditor shall have no priority, by virtue of this Agreement, over such claims of the undersigned.

3. The obligations of the undersigned are joint and several. This Agreement binds the undersigned and their respective heirs, personal representatives, successors and assigns and benefits Lender, its successors and assigns. The validity, construction and enforcement of this Agreement are governed by the internal laws of Wisconsin.

Dated JANUARY 7, 2003 _____

TRUE Q ENTERPRISES, INC. _____ (SEAL)

A WISCONSIN CORPORATION _____
(Type of Organization)

_____ (SEAL)

By _____
KEVIN S SCHEUNEMANN, PRESIDENT
JAMES A. SPELLA, Agent _____ (SEAL)

_____ (SEAL)

_____ (SEAL)

_____ (SEAL)

**TO:**      *Dairy Queen*® Direct-Licensed Franchisees and Territory Operators

**FROM:**   William C. Zucco, Executive Vice President and General Counsel

**DATE:**    March 1, 2007

**SUBJECT:** Franchise Transfer Procedures

---

**This system bulletin supersedes system bulletin #161-B, dated November 1, 2002.** The attached three pages entitled "American Dairy Queen Corporation (ADQ) Steps to Complete Transfers" provide the current transfer procedures for *Dairy Queen* stores, restaurants and franchises. This system bulletin does not apply to *Dairy Queen*® *Treat Center*® Stores. **These procedures are primarily updates and clarifications to previous versions, and will apply to all transfers effective immediately.**

## Frequently Asked Questions (FAQ)

### What situations constitute a transfer?

ADQ continues to enforce the language in Operating Agreements requiring that any change of ownership or change of control of the daily operations of the store is an event requiring compliance with transfer procedures. Consequently, depending on your Operating Agreement, a lease, installment sale, contract for deed, management agreement, sale of stock, or other change of control of the daily operation of the store is likely deemed a transfer.

### What should the seller do first?

The first step in any transfer is for the seller to contact the contract specialist for their area, either Nancy Kain at 952/830-0395 (nancy.kain@idq.com) or Renee Running at 952/830-0384 (renee.running@idq.com). The transfer process requires that certain obligations be met before others are started, and has a specific order that needs to be followed, and no closing should take place until the transfer requirements are met. See "Caution" on page 1 of the attached "Steps to Complete Transfers."

### If I transfer to my children, do I pay a transfer fee?

ADQ continues its policy of not charging a transfer fee for transfers to immediate family members (spouse, children or parents). All other steps to complete the transfer will apply, including completion of training and facility upgrades, unless the Operating Agreement precludes such requirements.

### What if I want to sell to my manager, but she does not meet the financial qualifications?

ADQ continues its practice of considering transfers to family members or store managers who do not financially qualify to purchase a franchise. ADQ may allow a transfer to such a party, provided that the seller guarantees the financial obligations of the buyer for a minimum of three years. Please see Note 2 to Paragraph 1 on page 2 of the attached "Steps to Complete Transfers" for details.

### Are there any changes to the transfer process?

Due to upgrades and changes in ADQ's Management Training, a new buyer is no longer required to complete five days of in-store work experience prior to attending ADQ's Management Training Program. While the five-day, in-store work experience is no longer required, ADQ highly recommends that the buyer spend some time working in a *Dairy Queen* location to gain a better understanding of the restaurant business and the unique aspects of managing a *DQ* operation prior to attending ADQ's Management Training Program.

Copyright 2007 American Dairy Queen Corporation

SB213 Attachment

This transfer bulletin reflects ADQ's commitment to the buyer that they will be in the best position possible to succeed in their new endeavor. It also reflects ADQ's commitment to consumers and other franchisees in the *DQ*® system that all stores licensed by ADQ are under the control of persons possessing the skills, training, management and financial qualifications to provide active supervision in a store that is in conformity with ADQ standards. The facility being purchased needs to meet current standards in order to maximize the opportunity for the Buyer to maintain the store's competitive position in today's marketplace and achieve an attractive return on their investment. The following steps are to be fulfilled PRIOR to ADQ's final approval to transfer a *Dairy Queen*® franchise and the operation of a *Dairy Queen* store or restaurant.

Any change of ownership or change of control of the daily operation of the store when it is deemed a transfer under your franchise/license/operating agreement is subject to these transfer requirements. Depending on the franchise agreement, a lease, installment sale, contract for deed, management agreement, sale of stock, or other change of control of the daily operation of the store may invoke transfer procedures.

**CAUTION:** Any change in the day-to-day management of the store prior to these transfer steps being followed will jeopardize that person, family or associate from ever owning this store or another *Dairy Queen* franchise. If a change takes place without following the transfer steps, the franchise will be placed in default and the only cure will be the Seller/Transferor taking back the store or restaurant and removing the unapproved management.

**If Franchise is in Default:** If the franchise being transferred is in default for any reason, including failure of evaluations or non-payment of accounts receivable, the transfer process will be on hold and will not move forward until the default is cured. Likewise, if the Buyer is already a *Dairy Queen, Orange Julius*® *(OJ)* or *Karmelkorn*® *(KK)* franchisee, any defaults on his/her current store(s) must be cured before ADQ will consider the transfer of another store to the Buyer. ADQ reserves the right to disqualify any Buyer for having a history of defaults or poor performance under any agreements with ADQ, *OJ* or *KK*. ADQ also reserves the right to disqualify any buyer that is not currently supporting (or has a history of not supporting) system initiatives and programs.

**Right of First Refusal:** If ADQ is granted a first right of refusal to purchase the franchise under the Seller's Operating Agreement, ADQ will review the Purchase Agreement and will make a decision within the time allotted by the Operating Agreement.

*Seller's Initial Obligations in order of occurrence*

1.    **Written Notification of Proposed Transfer:** Within a reasonable period of time prior to the proposed effective date, provide ADQ a brief written description of the proposed sale including the name and address of the proposed Buyer and the proposed effective date of transfer.

2.    **Transfer Fee:** If required by Seller's Franchise/Operating Agreement, ADQ must receive the Transfer Fee before ADQ will consider Buyer's Confidential Application form and Personal Financial statement. Seller and Buyer will determine who pays Transfer Fee, which will cover cost of the Background and Credit Checks described below in paragraph 4 under "Buyer's Initial Obligations in order of occurrence."

3.    **Profit and Loss Statement:** Provide ADQ with the latest 12-month Profit and Loss statement for the location to be transferred.

4.    **Purchase Agreement:** After Buyer has successfully completed the Readiness Assessment, the seller must provide ADQ with a fully signed copy of the Purchase Agreement executed by both Buyer and Seller. The Purchase Agreement must list the required facility improvements and whether the seller or buyer is responsible for completing them. The Purchase Agreement is provided to evidence the proposed sale; however, ADQ is not a party to the Purchase Agreement and does not review it for content or detail but rather to be apprised of whether the transfer requirements are being met.

5.    **Changes in Conditions and Terms:** If the terms or conditions of a proposed transfer change from those originally presented to ADQ, the changes must be submitted to ADQ by the Seller in writing for review and approval.

## Buyer's Initial Obligations in Order of Occurrence

1.  **Application and Financial Statement:** To provide ADQ with the completed Confidential Application form and Personal Financial statement (forms enclosed with ADQ's first letter to Buyer).

    A.    The financial requirements of an applicant are:

        1.    Net worth (exclusive of residence and personal items) totaling the <u>greater</u> of: 50% of the total purchase price of the transaction <u>or</u> $75,000.

        2.    Liquid assets totaling the greater of: 20% of the total purchase price of the transaction or $30,000.

        3.    Operating Capital (separate from liquid assets) totaling the greater of: $25,000 or 33% of fixed and semi-variable expenses, including debt service, and manager salary not to exceed $100,000.

    B.    Net worth and liquid assets must be substantiated in a financial statement with verification of each asset by a financial institution. The financial statement must reflect net worth over a period of time as opposed to a point in time, and be verified over that period of time by a financial institution.

    *Note 1*: If proposed buyer is an existing *Dairy Queen* franchisee, ADQ may consider making limited exceptions to the above minimum financial requirements.

    *Note 2*: ADQ may consider approval of a buyer who is a family member or who has been a store manager for at least two years but does not meet the minimum financial requirements, provided that seller is in good standing with ADQ and will guarantee the financial obligations of the buyer. This guarantee would last until the buyer has gone at least 3 full years (36 straight months) without being late on Store Monthly Reports or delinquent in Accounts Receivable to ADQ. The guarantee could also end sooner if, at any time, the buyer can meet the then-current financial requirements for a franchise transfer.

2.  **Terms of Financing:** To submit terms of any financing obtained for the purchase of the business (if not included in the Purchase Agreement).

3.  **Readiness Assessment:** The buyer who will own a majority interest in the franchise *and* the day-to-day manager of the store (if different from the majority owner) must pass a Readiness Assessment. Buyer will be provided with details needed to take Readiness Assessment and must pass the assessment before being approved to purchase a franchise and/or before attending ADQ's Management Training. This requirement will not apply to existing *Dairy Queen* franchisees except as a prerequisite to Management Training.

4.  **Background and Credit Check:** ADQ will have a background and credit check done on the Buyer, specifically any person whose financials are used to meet the minimum requirements and any person(s) who will own at least 10% interest in the franchise. The background check will include certain checks mandated by the federal government through the Patriot Act legislation. With the Confidential Application Form and the Personal Financial Statement, Buyer will submit a signed consent form allowing ADQ to perform the background and credit checks.

5.  **Break-Even Point Projection:** Submit to ADQ the Buyer's Break-Even Point Projection form signed by Buyer (enclosed in Buyer's package). ADQ reserves the right to take into consideration past performance of a Buyer who is an existing *Dairy Queen* franchisee.

6.  **Return Offering Circular Receipt:** If Buyer is to sign a new *Dairy Queen* Operating Agreement, after receiving a Franchise Offering Circular, Buyer returns to ADQ two signed and dated Acknowledgment of Receipt forms. Buyer must review the Franchise Offering Circular for at least ten (10) working days before signing a new *Dairy Queen Operating* Agreement.

7.  **Personal Interview:** Buyer will meet with the Director of Operations or Area Vice President for the region in which the transferring store is located for a personal interview. This Interview will consist of questions to evaluate the Buyer's ability to manage the *Dairy Queen* business from an Operations perspective.

**Upon Completion by Buyer of Initial Obligations:** Upon successful completion of the Readiness Assessment and the Personal Interview with a Director of Operations/Area Vice President, and upon return of the transfer Confidential Application form, Personal Financial statement, Purchase Agreement, Profit and Loss statement and the Break-Even Projection form, ADQ will either preliminarily qualify or disqualify the transfer.

A letter will be sent to the Seller and Buyer giving ADQ's provisional consent to the transfer and enclosing the appropriate legal documents. The letter will list the following items as they apply to the transfer. ALL items must be completed PRIOR to ADQ's final approval of the transfer:

1. **Professional Structural/Mechanical Inspection:** Buyer is required to hire a professional inspector to perform a building inspection of the *Dairy Queen* facility. Buyer will be provided with a form to sign and submit to ADQ evidencing completion of the inspection.

2. **Facility Upgrading:** ADQ will notify Buyer and Seller of any items needed to upgrade the facility to current system standards, as required by the Operating Agreement. Note that certain Operating Agreements, especially those dated 1989 and later, require periodic modernization and replacement, which may cause facility upgrading to be more extensive. ALL of these items must be completed satisfactorily to obtain ADQ's final consent to transfer.

3. **Management Training:** If Training is required by the Operating Agreement, ADQ's Management Training Course must be successfully completed *prior* to the Buyer taking control of the daily operation of the store/restaurant. There must be at least one person trained for each store having a training requirement in the franchise agreement. The Operating Agreement may require that if the Buyer plans to have a manager in daily operational control of the store, then both Buyer and Manager must successfully complete Management Training before the Buyer takes control of the operation.

    A. **ServSafe Certification:** Must be obtained by Buyer (and manager if applicable) prior to attending Management Training and will be a requirement for successful completion of Management Training.

    B. **ADQ's Provisional Consent to the Transfer:** Must be obtained by Buyer prior to attending Management Training.

    C. **Communicate in English:** To successfully complete the Management Training course, the attendee must be able to communicate effectively in English, both spoken and written. This requirement is part of ADQ's effort to ensure that the person in charge of the store is able to effectively communicate policies, procedures and safety issues to all employees, and to effectively communicate with customers and representatives of ADQ and suppliers.

4. **Escrow and ADQ Reconciliation:**

    A. **Escrow:** ADQ highly recommends that monies be held in escrow until the buyer is satisfied that all of the seller's financial obligations have been met. Since ADQ cannot authorize the release of escrow funds, the Buyer and Seller must make their own arrangements for the release of escrow.

    B. **ADQ Reconciliation:** ADQ will reconcile License and Sales Promotion Fees (and Land/Building rent and payment of any Security Agreement with DQF, if applicable) upon receipt of final Store Monthly Report and signed copies of the Assignment document showing effective date of transfer. Seller will be notified of any amounts due based on ADQ's reconciliation of the final Store Monthly Report. ALL balances owed to ADQ and any guaranteed suppliers must be paid prior to ADQ giving its final consent to the transfer.

5. **Transfer Documents:**

    A. **Assignment:** If the Seller's Operating Agreement is to be assigned, Assignment and Consent to Assignment documents will be sent to the Seller. These documents will not be executed by ADQ until ALL transfer requirements have been completed.

    B. **New Operating Agreement:** If the Buyer is to sign a new *Dairy Queen* Operating Agreement, Termination of Franchise Agreement documents will be sent to the Seller and *Dairy Queen* Operating Agreements will be sent to the Buyer. These documents will not be executed by ADQ until ALL transfer requirements have been completed.

6. **General Liability Insurance:** A Certificate of Insurance covering General Liability Insurance in the minimum amount called for by the Operating Agreement must be submitted by Buyer to ADQ, including ADQ as an additional insured party, if called for by the Operating Agreement.



**Vol. 81, No. 10,** October 2008

# Protecting Consumers in the Modern Age: Wisconsin's Deceptive Trade Practices Act

Wisconsin's Deceptive Trade Practices Act prohibits untrue, deceptive, or misleading representations in the sale of goods and services to the public. The Wisconsin Supreme Court recently has decided several important issues arising out of the Act's application in the ever-changing business and consumer world.

*by* Mark R. Hinkston

**Sidebar:**

- Deceptive Trade Practices Act Primary Provision



I n 1913, the Wisconsin Legislature enacted the precursor to what is today known as the Deceptive Trade Practices Act (DTPA or the Act), set forth at section 100.18 of the Wisconsin Statutes.[1] At the time of the law's enactment, print was the primary marketing media. Radio was still unavailable to most people and television had yet to be invented. The Internet, television infomercials, telemarketers, and cellular phones were likely unimaginable. The ensuing century brought exponential growth and technological complexity, spawning countless new products and ways to market them. Today's vastly different, and far more complex, consumer landscape makes the DTPA more valuable than ever in consumer protection.

The Act's primary proviso - a 225-word sentence - appears in section 100.18(1). It generally provides that no person or entity intending to sell, distribute, increase the consumption of, or in any way[2] dispose of any real estate, merchandise, securities, employment, or service or intending to induce the public to enter into any contract relating thereto, may make any untrue, deceptive, or misleading advertisements, announcements, statements, or representations in conjunction with such transaction.

With the dramatic transformation of technology and marketing, the DTPA has been applied to new contexts, necessitating modern-day judicial interpretations of the Act's prima facie elements. Over the past few years the Wisconsin Supreme Court has had the opportunity to address, for example, who is a member of *the public* under the Act, the type of statements considered *deceptive*, and the concept of *reliance*. This article explores the history of the Act, the Act's components, and recent developments in its application and interpretation.

## Background

**Purpose.** Entitled "Fraudulent representations," section 100.18 is a multi-section statute "intended to protect the residents of Wisconsin from any untrue, deceptive or misleading representations made to promote the sale of a product."[3] It is "broad in scope, affecting numerous entities, products, services, and means of communication."[4] It "was enacted to address the shortcomings of common law protections for consumers" and to protect against both overt and implicit deception.[5] Its general purpose "is to prevent certain activities deemed harmful to citizens' economic and social well-being," even though the damages

from such illegal activities may not be easy to quantify.[6]

While today the Act is most commonly referred to as Wisconsin's Deceptive Trade Practices Act, it is colloquially referred to by several other names, such as the Wisconsin consumer fraud statute,[7] Wisconsin's statutory misrepresentation law,[8] the deceptive advertising statute,[9] and Wisconsin's false advertising statute.[10] The Act is sometimes interpreted by resort to cases involving similar federal laws,[11] such as the Federal Trade Commission Act, which makes unlawful unfair or deceptive acts or practices in commerce.[12]

In addition to prohibiting untrue, deceptive, or misleading advertisements, announcements, statements, or representations in transactions with the public, the Act also addresses prohibited conduct in certain specific contexts. For example, it prohibits deceptive combination-sale[13] and "closing-out sale" advertisements,[14] prescribes standards for motor fuel price disclosure,[15] and prohibits "bait and switch" advertising[16] and deceptive pricing.[17]

**DATCP Enforcement.** The Wisconsin Department of Agriculture, Trade and Consumer Protection (DATCP) is granted authority to enforce the DTPA.[18] The DATCP and the Wisconsin Department of Justice have authority to initiate a circuit court action to enjoin violations, and the court may order restitution.[19] While there are no criminal penalties for violating section 100.18(1), civil forfeitures may be imposed.[20]

**Private Cause of Action.** Before 1970, parties had no private remedy under the DTPA. In that year, legislation was enacted to allow plaintiffs to sue in circuit court for money damages for DTPA violations.[21] A plaintiff is entitled to recover for pecuniary losses, costs, and reasonable attorney fees.[22] A person suffering pecuniary loss because of a violation of an injunction may recover double damages, costs, and reasonable attorney fees.[23] An action must be commenced within three years after the occurrence of the alleged unlawful act or practice,[24] not within three years of discovery.[25]

**Scope.** When originally enacted, the DTPA applied just to print "advertisements" in newspapers, circulars, pamphlets, and posters and not to verbal misrepresentations.[26] Over the years, the legislature has expanded its reach "to afford consumers new protections to keep pace with increasingly sophisticated methods of disseminating information."[27] For example, in 1945, the legislature added radio, television, and magazines to the list of media in the Act "to reflect the changes which had taken place in marketing methods."[28]

As a result of subsequent amendments, today the Act applies to representations "in a newspaper, magazine or other publication, or in the form of a book, notice, handbill, poster, bill, circular, pamphlet, letter, sign, placard, card, label, or over any radio or television station, or in any other way similar or dissimilar to the foregoing."[29] In other words, the Act now "prohibits deceptive, misleading, or untrue statements of any kind to the public made in a commercial setting, no matter how made."[30]

Despite the reference to traditional forms of advertising, section 100.18 provides a remedy for more than mere "false advertising." The Act is not limited to media advertising; it also applies to oral representations made in private conversations to prospective purchasers of products,[31] such as part of a face-to-face sales promotion.[32] The statement need not be made to a large audience because the DTPA covers fraudulent representations made to just one person.[33]

**Expanding Contexts.** Plaintiffs have asserted DTPA claims in a variety of settings and contexts. For example, section 100.18 provides a claim to purchasers of residential and commercial real estate for sellers' fraudulent representations.[34] Plaintiffs also have premised DTPA claims on statements made via media that are not specifically referenced in the Act, such as Web sites.[35] Claims also have been asserted against municipalities[36] and state agencies.[37] Consumers, with varying degrees of success, have brought class actions premised on alleged DTPA violations arising out of the sale of motorcycles,[38] motor vehicles,[39] printer cartridges,[40] laser eye surgery,[41] and securities.[42]

The DTPA does not just apply to claims of consumers who are deceived by advertising for consumer products or services. Commercial entities also may assert claims under the Act.[43] For example, commercial plaintiffs have asserted DTPA claims in situations involving a business's purchase of equipment or machinery from another business,[44] a business entering into a contractual relationship to sell its products,[45] and a business's purchase of commercial real estate.[46] Other examples include cases in which an investor asserted a DTPA claim based on allegations that a holding company falsely represented that it would



merge with a target company[47] and in which a business alleged that a competitor's fraudulent representations regarding the business's product caused it to lose customers.[48]

**Mark R. Hinkston**, Creighton 1988 cum laude, practices with Dye, Foley, Krohn & Shannon S.C., Racine.

**Nonapplicability.** The DTPA does not apply to every business and consumer transaction involving the public. For example, it is not applicable to the insurance business[49] or to deceptive practices regarding the sale of food.[50] It also does not apply to licensed real estate brokers or salespersons unless they have "directly made, published, disseminated, circulated or placed before the public an assertion, representation or statement of fact with the knowledge that the assertion, representation or statement of fact is untrue, deceptive or misleading."[51]

**Elements.** The DTPA "serves a remedial purpose, going further than the common law in providing a cause of action to consumers who have been deceived or mislead."[52] Thus, while some courts have likened a section 100.18 claim to a fraud cause of action sounding in tort,[53] section 100.18 is not a remedy for common law misrepresentation claims.[54] Instead, it affords a distinct statutory cause of action.[55]

There are three elements in a cause of action under the DTPA: 1) The defendant made a representation to the public with the intent to induce an obligation. 2) The representation was untrue, deceptive or misleading. 3) The representation caused the plaintiff a pecuniary loss.[56] Several recent appellate court decisions have helped to further interpret and define these elements by shedding light on the parameters of *the public*, considering the nature of puffery, and clarifying the concept of reliance.

## The Public: Focus on "Particular Relationship"

To state a claim under the DTPA, the plaintiff must be considered a member of the public for the purpose of the subject transaction. Although "[p]otentially, any person or entity is a member of the public," Wisconsin courts have declined to hold that the term *public* includes everyone.[57]

The DTPA does not specifically define *the public*, likely because when the law was initially passed in 1913, it applied only to false print advertising. The first judicial interpretation of the public under section 100.18 came more than 60 years later, in 1974. In *State v. Automatic Merchandisers of America Inc.,*[58] the state brought an action against vending machine sellers engaged in a marketing scheme to sell vending machines at excessive prices. Under the scheme, the defendants would contact at their homes persons who had responded to classified ads. In support of a claim under section 100.18, it was alleged that some of the promotional materials and oral representations presented to these persons at their homes were untrue, deceptive, or misleading.

The defendants contended that the statute did not apply because the transactions involved private statements to prospective purchasers and not dissemination to the public. In addressing the issue, the supreme court recognized the difficulty of defining public and the necessity of looking at each case's facts and circumstances. It noted that the number of people involved is not controlling and that even only one person could constitute the public. The important factor is whether there is a *particular relationship* between the defendant and the prospective purchaser that would distinguish the prospective purchaser from the public that the legislature intended to protect.[59]

The court did not specify when a relationship would be considered particular enough so that a plaintiff would not be part of the public under the Act. It held that there was "no peculiar relation between the defendants and the prospective purchasers which would distinguish the prospective purchasers from `the public' which the legislature intended to protect. These people simply responded to the defendants' notices in the classified sections."[60]

Almost 30 years later, the Wisconsin Court of Appeals further elaborated on the particular-relationship test. In *Kailin v. Armstrong*,[61] commercial real estate purchasers asserted a section 100.18 claim. The court noted that once the purchase contract was entered into, the purchasers were no longer the public under the statute because at that point, they had a particular relationship with the seller - that of a contracting party. Because "[s]tatements made by the seller after a person has made a purchase or entered into a contract to purchase logically do not cause the person to make the purchase or enter into the contract," the court concluded that the plaintiffs' section 100.18 claim "was limited to representations that were made prior to the acceptance of the offer to purchase and that otherwise meet the requirements of the statute."[62]

In 2007, in *K & S Tool & Die Corp. v. Perfection Machinery Sales Inc.,*[63] the Wisconsin Supreme Court

further elaborated on the definition of the public. K & S, a tool and die maker, contacted the defendant, a seller of used industrial machines, to obtain a punch press with certain specifications. The defendant sold K & S a press that did not meet the specifications. K & S asserted numerous claims, including one under the DTPA. The jury found that K & S was a member of the public and that the defendant had violated the DTPA, causing damages of $306,000.

On appeal, in determining whether K & S was a member of the public, the supreme court applied the particular-relationship test used in *Automatic Merchandisers* and *Kailin*. It noted that the substance of a representation made to induce an obligation has more significance in the determination than does the form of the initial contact. Also, it hearkened back to *Kailin* to stress that a plaintiff is no longer a member of the public once he or she has entered into a contract to purchase the offered item.

The court concluded that sufficient evidence was presented to support the jury's conclusion that K & S was a member of the public. Because the defendant touted "the country's largest inventory of used late model presses, fabricating and metalworking equipment," and in view of its status as an industry leader, the jury could reasonably infer that K & S contacting the defendant for a used press would not be sufficient to create a particular relationship. Additionally, the jury could have determined that a prior equipment purchase was too isolated to establish a particular relationship. The jury also could reasonably infer that the defendant's agreement to make K & S aware of any suitable presses did not rise to the level of the defendant and K & S having a particular relationship if defendant always tried to help customers in that same way.

The court concluded that there is no bright-line test to determine whether parties have a particular relationship. The existence of a particular relationship "will depend upon its own peculiar facts and circumstances and presents a question of fact."[64] The supreme court stated that a plaintiff remains a member of the public unless a particular relationship exists between a plaintiff and a defendant.

The standard that a plaintiff is a member of the public unless a particular relationship exists between it and the defendant suggests that defendants will need to prove the existence of a particular relationship to avoid liability under the Act. In some cases, the determination will be fairly straightforward because, in view of the appellate court pronouncements and test, contracting parties[65] and those with a significant business relationship[66] generally will not qualify. In other cases, it will be up to the trier of fact to determine whether a plaintiff "cannot be expected to be educated enough about the other party to protect their own interests" and thus is within the public, or is "in a better position than most to protect themselves in the context of that relationship" as a result of a "long-term, established" relationship and thus outside the public and not in need of the DTPA's protections.[67]

## Nature of Statements: Exceptions for Silence and Puffery

Under section 100.18(1), a plaintiff must prove that a subject representation "was untrue, deceptive or misleading." Proving that a statement is untrue is usually easier than proving that it is deceptive or misleading because the latter terms often do not have a clear definition. A statement is "untrue if it is false, erroneous, or does not state or represent things as they are" and is "deceptive or misleading if it causes a reader or listener to believe something other than what is in fact true or leads to a wrong belief."[69] Even if a statement is literally true, it can be considered deceptive if it conveys a false meaning.[70]

In *Tietsworth v. Harley-Davidson Inc.,*[71] the Wisconsin Supreme Court shed light on two situations in which statements will not give rise to a claim under section 100.18, namely when a defendant is accused of nondisclosure or when a defendant is accused of exaggeration as to a product's attributes (more commonly known as *puffery*). Owners and lessees of Harley motorcycles brought a class action, asserting among other claims a DTPA claim arising out of Harley-Davidson's advertising of its TC-88 motorcycle. The plaintiffs alleged that Harley-Davidson failed to disclose an engine defect. The court held that the plaintiffs did not state a claim under section 100.18 because a nondisclosure (or silence - "an omission to speak") does not constitute an "assertion, representation or statement of fact" under the Act. It concluded that the "DTPA does not purport to impose a duty to disclose, but, rather, prohibits only affirmative assertions, representations, or statements of fact that are false, deceptive, or misleading."[72]

The plaintiffs also premised their claims on allegations that Harley advertised the motorcycle engine as "premium" quality, "a masterpiece," and "[e]ighty-eight cubic inches filled to the brim with torque and ready to take you thundering down the road." The court held that these statements did not support a DTPA claim because they were mere commercial puffery. According to the court, puffery is "the exaggerations reasonably to be expected of a seller as to the degree of quality of his product, the truth or falsity of which

cannot be precisely determined."[73]

In so holding, the court hearkened back to its 1988 decision in *State v. American TV & Appliance of Madison Inc.*,[74] where it held that "[a] general statement that one's products are best is not actionable as a misrepresentation of fact" and concluded that the characterization of a product as "the best" or "the finest" and a sale as a "clearance" or "closeout" were examples of puffery, which, it noted, was "long considered an acceptable advertising technique."[75] The *Tietsworth* court noted that "commercial puffs" are not actionable misrepresentations because they are "not capable of being substantiated or refuted," and a factfinder would have as "little hope" of determining whether the TC-88 was indeed "a masterpiece" as it would determining whether it was "the best." Furthermore, the statement that the TC-88 is "filled to the brim with torque and ready to take you thundering down the road" was too unspecific to allow it to be proved or refuted.[76] In a dissent, Justice Abrahamson noted that "[t]he distinction between a statement of fact, a statement of opinion, and puffery is often faint, uncertain, and not easily drawn."[77]

## Reasonable Reliance: Not A Prima Facie Element

The plaintiff also must prove that he or she sustained a pecuniary loss as a result of the untrue, deceptive, or misleading representation. The test is whether the plaintiff would have acted in the absence of the representation.[78] While the representation need not be the sole motivation to proceed with the transaction, it must have been a material inducement (in other words, a significant factor contributing to the plaintiff's decision).[79]

In DTPA cases, a plaintiff's actions in response to representations are material in determining whether he or she has relied on the statements (or in other words, whether there has been a material inducement). Recently, in *Novell v. Migliaccio*,[80] the Wisconsin Supreme Court addressed whether a plaintiff was required to prove that his reliance was reasonable. The plaintiff asserted a section 100.18 misrepresentation claim arising out of the purchase of a house with a leaky basement. The circuit court dismissed the claim on summary judgment, agreeing with the defendant sellers that the plaintiff was required to prove "reasonable reliance" on the defendants' allegedly fraudulent misrepresentations. It determined as a matter of law that because he did not do so he was not justified in relying on the sellers' misrepresentations.

The court of appeals reversed, concluding that reasonable reliance is not a prima facie element of a DTPA claim. The supreme court affirmed, concluding that based on the language and purpose of section 100.18 and case law interpreting the section, a plaintiff asserting a section 100.18 claim is not required to prove reasonable reliance. However, it noted that the reasonableness of a plaintiff's reliance is relevant in considering whether the representation materially induced (caused) the plaintiff to sustain a loss.

The supreme court concluded that the circuit court erred in granting summary judgment because there remained genuine issues of material fact as to whether the plaintiff's reliance on the representation was unreasonable (in other words, whether the representation here was a material inducement causing the plaintiff's loss). The evidence conflicted as to whether the plaintiff's reliance was unreasonable. A home inspection report indicating problems was contradicted with the sellers' statements that the basement walls had not been painted, that the cracks and bow in the walls had not moved, and that there had been no water in the basement during the nine years the sellers owned the house. The court noted that "[t]his is not a case where it is beyond any reasonable doubt that the homebuyer simply refused to take the definitive advice of a home inspector."[81] The court also noted that "there are cases in which a circuit court may determine as a matter of law that a plaintiff's belief of a defendant's representation is unreasonable, and as a result the plaintiff's reliance is therefore also unreasonable. In such cases the circuit court may determine that the representation did not materially induce (cause) the plaintiff's decision to act as a matter of law. This, however, is not such a case."[82]

In noting that there are circumstances in which a circuit court may determine that a representation did not materially induce the plaintiff's decision to act and that the plaintiff would have acted in the absence of the representation, the supreme court discussed an example originally given by the court of appeals. It noted that a circuit court may determine that a plaintiff's reliance on a claim that a Superman cloak could "actually permit someone to fly" is unreasonable.[83] On that basis, the court may further determine that such claim did not, as a matter of law, materially induce a person to purchase the cloak. Thus, the representation could not cause the buyer's pecuniary loss as a matter of law.

Of course, the vast majority of situations will involve claims that are far less clear than the "Superman cloak" scenario. As with the member-of-the-public analysis, because each scenario is different, it is

impossible to devise a bright-line test to address every circumstance in assessing reliance. In the interim, in view of the court's confirmation that reliance is an aspect of the third element - whether a representation caused the plaintiff's pecuniary loss - and that evidence as to reasonableness may be presented on the causation issue, the pattern jury instruction (2418) for an unfair trade practice claim under section 100.18 (1) should be supplemented to expressly reference that the defendant may present evidence of unreasonableness.

The fact that reasonable reliance is not a prima facie element for a section 100.18 claim is in contrast with common law misrepresentation claims, which mandate it.[84] DTPA claims differ from common law misrepresentation claims in two other ways. First, in *Kailin v. Armstrong*,[85] the court of appeals held that the economic loss doctrine (ELD) does not apply to bar a claim under section 100.18. According to the ELD, a purchaser of a product cannot recover on a tort theory for damages that are solely economic.

Recently, in *Below v. Norton*,[86] the Wisconsin Supreme Court held that the ELD bars common law claims for intentional misrepresentation in residential real estate transactions. While it did not specifically address the issue of the ELD in the context of the DTPA, the court did note that the ELD's bar on the common law intentional misrepresentation claim would not leave the plaintiff without a remedy because a home purchaser "can be assured that applying the ELD still leaves statutory and contractual remedies available where misrepresentation has occurred."[87] The court noted that the section 100.18 claim was still viable because it had been remanded to the circuit court.

Another difference is that with a common law intentional misrepresentation claim, a plaintiff must prove intent to deceive.[88] Conversely, under the DTPA, a plaintiff need only show that the defendant had an intent to sell or distribute the particular product or intended to induce the purchase or use of the product. The statement need not be made with knowledge of its falsity or with an intent to defraud or deceive.[89]

## Conclusion

Because a person who brings a DTPA claim need not prove intent to deceive or reasonable reliance and need not worry about the economic loss doctrine, the DTPA is an intriguing alternative to common law misrepresentation for fighting unfair trade practices. Continued technological growth and advancement in marketing techniques, both of which expand the potential contexts for deceptive trade practices and the number of people who will need the DTPA's protections, will present many new contexts ripe for its application. The absence of bright-line tests to determine whether a person is part of the public or reasonably relied on a representation and the inherent uncertainty in determining whether a statement is puffery, make it likely that further appellate court interpretation will indeed be necessary to flesh out the parameters of the various facets under the DTPA as the Act is applied in the future.

## Endnotes

1 1913 Wis. Laws, ch. 510. *See* Reid W. Klopp, *Controls on Advertising: Wisconsin's Fraudulent Advertising Law*, 53 Wis. Bar Bull. 25 (Sept. 1980).

2 The official statute, apparently erroneously, contains the word "wise" instead of "way."

3 *State v. Automatic Merch. of Am. Inc.*, 64 Wis. 2d 659, 663, 221 N.W.2d 683 (1974).

4 *Tietsworth v. Harley-Davidson Inc.*, 2004 WI 32, ¶ 81, 270 Wis. 2d 146, 677 N.W.2d 233.

5 Cullen Goretzke, *The Resurgence of Caveat Emptor: Puffery Undermines the Pro-Consumer Trend in Wisconsin's Misrepresentation Doctrine*, 2003 Wis. L. Rev. 171, 222. *See also Kailin v. Armstrong*, 2002 WI App 70, ¶ 40, 252 Wis. 2d 676, 643 N.W.2d 132 (noting that legislature in enacting section 100.18 chose "to provide protection and remedies for false advertising that do not exist at common law").

6 *Tim Torres Enters. Inc. v. Linscott*, 142 Wis. 2d 56, 72, 416 N.W.2d 670 (Ct. App. 1987).

7 *Demitropoulos v. Bank One Milwaukee N.A.*, 924 F. Supp. 894, 897 (N.D. Ill. 1996).

8 Goretzke, *supra* note 5.

9 *Skrupky v. Elbert*, 189 Wis. 2d 31, 38, 526 N.W.2d 264 (Ct. App. 1994).

10 *Selzer v. Brunsell Bros. Ltd.*, 2002 WI App 232, ¶ 29, 257 Wis. 2d 809, 652 N.W.2d 806.

11 *See, e.g., Tim Torres Enters.*, 142 Wis. 2d at 72 (stating "[t]he broad remedial scope of sec. 100.18 and its protective purpose make it similar to the remedial provisions of the federal antitrust laws in that to eliminate or rectify a wrong the traditional standards of proof may be relaxed if necessary").

12 15 U.S.C. § 45(a)(1). See also 15 U.S.C. § 1125(a)(2) [§ 43(a)(2) of the Lanham Act], which "prohibits the use of false or misleading statements or representations of fact in commercial advertising, and establishes a private remedy for any violation thereof." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir. 1992).

13 Wis. Stat. § 100.18(2)(a).

14 Wis. Stat. § 100.18(3m).

15 Wis. Stat. § 100.18(6), (8).

16 Wis. Stat. § 100.18(9)(a).

17 Wis. Stat. § 100.18(2)(a).

18 Wis. Stat. § 100.18(11)(a).

19 Wis. Stat. § 100.18(11)(d).

20 Wis. Stat. § 100.26(1), (4). There are criminal penalties for misrepresenting that one operates a local business [Wis. Stat. § 100.18(10)] and for engaging in "bait and switch" tactics [Wis. Stat. § 100.18(9)]. Wis. Stat. § 100.26(4m), (5).

21 1969 Wis. Laws, ch. 425, §§ 1, 2 (effective March 1, 1970).

22 Wis. Stat. § 100.18(11)(b)2.

23 *Id* .

24Wis. Stat. § 100.18(11)(b)3.

25Selzer , 2002 WI App 232, ¶ 29, 257 Wis. 2d 809.

26James D. Jeffries, *Protection for Consumers Against Unfair and Deceptive Business*, 57 Marq. L. Rev. 559, 561 (1974).

27Tietsworth, 2004 WI 32, ¶ 82, 270 Wis. 2d 146.

28Automatic Merch. Inc ., 64 Wis. 2d at 663.

29Wis. Stat. § 100.18(1).

30Dorr v. Sacred Heart Hosp., 228 Wis. 2d 425, 445, 597 N.W.2d 462 (Ct. App. 1999). *See also Grube v. Daun*, 173 Wis. 2d 30, 57, 496 N.W.2d 106 (Ct. App. 1992) ("Although on its face this statute seems to apply only to advertising practices, the Wisconsin Supreme Court and this court have made clear that the statute intends to protect the public from all untrue, deceptive or misleading representations made in sales promotions, including representations made in face-to-face sales where no media advertising is involved").

31Automatic Merch. , 64 Wis. 2d at 663.

32Bonn v. Haubrich, 123 Wis. 2d 168, 174, 366 N.W.2d 503 (Ct. App. 1985) (stating "[u]ntruths, deceptions or misleading representations are no less harmful when they follow an initial telephone contact than a media advertisement").

33Automatic Merch., 64 Wis. 2d at 664. *See also Jersild v. Aker*, 775 F. Supp. 1198, 1205 (E.D. Wis. 1991) ( "While the readily apparent legislative goal underlying the enactment of § 100.18 is to protect all members of [the] public from fraudulent advertisements and deceptive marketing practices, in its practical application, the section individually protects each member of the public").

34Grube, 173 Wis. 2d at 116.

35Madcap I LLC v. McNamee, 2005 WI App 173, 284 Wis. 2d 774, 702 N.W.2d 16 (holding, in case in which buyer of warehouse storage racks brought action against seller alleging section 100.18 claim, that genuine issues of material fact existed as to whether seller made a misrepresentation on its Web site).

36See, e.g., American Med. Transp. of Wis. Inc. v. Curtis-Universal Inc., 148 Wis. 2d 294, 435 N.W.2d 286 (Ct. App. 1988), *rev'd in part*, 154 Wis. 2d 135, 452 N.W.2d 575 (1990) (denying motion to dismiss claims against city of Milwaukee arising out of its emergency ambulance service program).

37See, e.g., Bates v. Wisconsin, No. 08-CV-465-SLC, 2008 WL 3981455 (W.D. Wis. Aug. 22, 2008) (slip opinion) (asserting claim against Wisconsin Department of Workforce Development and Division of Vocational Rehabilitation arising out of alleged fraudulent promises about funding business plan).

38Tietsworth, 2004 WI 32, 270 Wis. 2d 146.

39Battle v. Nissan Motor Acceptance Corp., No. 05-C-0669, 2007 WL 1095681 (E.D. Wis. March 9, 2006) (unpublished opinion).

40Valenti v. Hewlett-Packard Co., No. 03-2257, 2004 WL 1277490 (Wis. Ct. App. June 3, 2004) (unpublished opinion).

41Meyer v. Laser Vision Inst., 2006 WI App 70, 290 Wis. 2d 764, 714 N.W.2d 223.

42John F. Struck Trust v. Offerman & Co., No. 92-1882, 1993 WL 299348 (7th Cir. Aug. 2, 1993) (unpublished opinion).

43Stoughton Trailers Inc. v. Henkel Corp., 965 F. Supp. 1227, 1236-37 (W.D. Wis. 1997) (" The plain language of the statute contains no indication that plaintiff should be barred from availing itself of the law's protection merely because it is a sophisticated business. The state supreme court has permitted commercial entities to recover under this statute in the past").

44K & S Tool & Die Corp. v. Perfection Mach. Sales Inc., 2007 WI 70, 301 Wis. 2d 109, 732 N.W.2d 792.

45Winkelman v. Kraft Foods Inc., 2005 WI App 25, ¶ 15, 279 Wis. 2d 335, 693 N.W.2d 756 (stating, in a dispute over a farmer's contract to sell "the entire output of milk" produced on his farm, "we see no reason why the seller of a product who is fraudulently induced by a buyer's misrepresentation to contract for its sale on terms advantageous to the buyer should be any less worthy of protection under the statute than a buyer who is induced by a seller's falsehood into overpaying for a product or service").

46Kailin, 2002 WI App 70.

47Shepherd Inv. Int'l Ltd. v. Verizon Comm'ns Inc, 373 F. Supp. 2d 853 (E.D. Wis. 2005).

48See Tim Torres Enters., 142 Wis. 2d 56 (upholding jury verdict in favor of one seller of frozen custard against another who published untrue statements that caused plaintiff seller to suffer pecuniary loss).

49Wis. Stat. § 100.18(12)(a).

50Gallego v. Wal-Mart Stores Inc., 2005 WI App 244, 288 Wis. 2d 229, 707 N.W.2d 539.

51Wis. Stat. § 100.18(12)(b).

52Tietsworth, 2004 WI 32, ¶ 81, 270 Wis. 2d 146.

53Kuiper v. American Cyanamid Co., 913 F. Supp. 1236, 1245 (E.D. Wis. 1996), *aff'd*, 131 F.3d 656 (7th Cir. 1997).

54Kailin, 2002 WI App 70, ¶ 40, 252 Wis. 2d 676.

55Id.

56Tietsworth, 2004 WI 32, ¶ 39, 270 Wis. 2d 146. *See also* Wis JI-Civil 2418.

57Uniek Inc. v. Dollar General Corp., 474 F. Supp. 2d 1034, 1038 (W.D. Wis. 2007).

5864 Wis. 2d 659, 221 N.W.2d 683 (1974).

59Id . at 664.

60Id.

612002 WI App 70, 252 Wis. 2d 676, 643 N.W.2d 132.

62Id. ¶ 45.

632007 WI 70, 301 Wis. 2d 109, 732 N.W.2d 792.

64Id . ¶ 30.

65See, e.g., D and B Auto. Equip. Inc. v. Snap-On Inc., No. 03-CV-141, 2006 WL 776749 (E.D. Wis. March 27, 2006) (" The fraudulent and deceptive conduct alleged in this case was directed towards plaintiffs alone in the context of the contractual relationship they had with the defendants regarding the Shark systems, thereby taking it out of the scope of conduct these statutes were intended to remedy").

66See, e.g., Uniek, 474 F. Supp. 2d at 1039 (holding that plaintiff picture frame manufacturer was not a member of the public; plaintiff had ongoing relationship with defendant retailer for 13 years, selling as much as $12 million of merchandise annually, and parties signed "letter of understanding" whereby plaintiff became defendant's primary picture frame supplier); Mayville Die & Tool Inc. v. Weller Mach. Co., No. 01-1509-FT (Wis. Ct. App. Nov. 29, 2001) (affirming summary judgment dismissal of plaintiff's 100.18 claim in case in which plaintiff contacted one of its distributors for a vertical boring mill because parties had ongoing business relationship that led plaintiff to contact defendant for assistance in locating machinery and thus plaintiff was not member of the public within meaning of statute).

67Uniek, 474 F. Supp. 2d at 1039.

68Wis. JI-Civil 2418.

69Klopp, supra note 1 (citing Murray Space Shoe Corp. v. FTC, 304 F. 2d 270 (2d Cir. 1962)). *But see Uebelacker v. Paula Allen Holdings Inc.*, 464 F. Supp. 2d 791, 805 (W.D. Wis. 2006) ("Mere implication, however, does not amount to the use of false, deceptive or misleading words as required under Wis. Stat. § 100.18(1)").

712004 WI 32, 270 Wis. 2d 146, 677 N.W.2d 233.

72Id . ¶ 40.

73Id. ¶ 41.

74146 Wis. 2d 292, 430 N.W.2d 709 (1988).

75Id. at 302.

762004 WI 32, ¶ 44, 270 Wis. 2d 146.

77Id. ¶ 99 (Abrahamson, C.J., dissenting).

78Wis. JI-Civil 2418.

79Id.

802008 WI 44, -- Wis. 2d --, 749 N.W.2d 544.

81Id. ¶ 59.

82Id. ¶ 61.

83Id. ¶ 52.

84Id. ¶ 45 (stating "[u]nlike common law causes of action for misrepresentations, reasonable reliance is not the standard for a [§ 100.18] claim because the legislature created a distinct cause of action").

852002 WI App 70, 252 Wis. 2d 676, 643 N.W.2d 132.

862008 WI 77, -- Wis. 2d --, 751 N.W.2d 351.

87 *Id.* ¶ 5.

88 *Kailin*, 2002 WI App 70, ¶ 40, 252 Wis. 2d 676.

89 Wis. JI-Civil 2418. *See also State v. Holmgren*, No. 82-344 (Wis. Ct. App. Jan. 25, 1983) (unpublished opinion) ("Specific intent to deceive is not an element of false advertising").

*Wisconsin Lawyer*

© 2010, State Bar of Wisconsin, P.O. Box 7158, Madison WI 53707-7158.
Customer service, (800) 728-7788. For problems with this site, contact the webmaster.
Disclaimer of Liability | Terms & Condition of Use | Privacy Statement | Advertising Live 1