U.S. DISTRICT COURT
EASTERN DISTRICT-WI
FILED
2010 JUN -2 A 9 40
JOHN W. SANFILIPPO, CLERK
MAIL-REC'D

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

Kevin Scheunemann,
        Plaintiff,      Court File No.: 2:09-cv-1134

v.

Associated Creditors Exchange, Inc. aka ACE,
        Defendant.

# Reply in support of Plaintiff's Partial Motion for Summary Judgment

    Defendant's response to Plaintiff's partial motion for summary judgment essentially was: we don't deny the facts of the collection behavior, but since we claim it was a commercial debt we were collecting, the court should give us a pass on all the issues. The claim, by Associated Creditors Exchange (ACE), that it's a "commercial" debt for collection, to escape liability under the Wisconsin Consumer Act (WCA) and Fair Debt Collections Practices Act (FDCPA), defense fails on two fronts.

    1.)    Kevin Scheunemann's affidavit testifying the *transactions* of the underlying U.S. Bank account for collection were for "personal, household, and family" purposes under 15 § U.S.C. 1692 (a) was unrefuted.

    2.)    Matthew Berardi, corporate counsel for ACE, is not a *qualified custodian* of the records of U.S. Bank under Wis. Stat. § 908.03 (6) to be a qualified witness of firsthand knowledge as to the "consumer" or "commercial" aspect of the underlying *transactions* for debt collection.

    Defendant's legal counsel made a lot of wild and unsubstantiated claims in his briefs about Mr. Scheunemann's affidavit. However, statements of counsel, in brief, or in argument, **are not facts before the court**. See *United States v. Lovasco* (06/09/77) 431 U.S. 783, 97 S. Ct. 2044, 52 L. Ed. 2d 752, *Gonzales v. Buist*. (04/01/12) 224 U.S. 126, 56 L. Ed. 693, 32 S. Ct. 463, *Holt v. United States*, (10/31/10) 218 U.S. 245, 54 L. Ed. 1021, 31 S. Ct. 2, *Telephone Cases. Dolbear v. American Bell Telephone*

*Company, Molecular Telephone Company v. American Bell Telephone Company. American Bell Telephone Company v.. Moleecualar Telephone Company, Clay Commercial Telephone Company v. American Bell Telephone Company, People's Telephone Company v. American Bell Telephone Company, Overland Telephone Company v. American Bell Telephone Company,*. (PART TWO OF THREE) (03/19/88) 126 U.S. 1, 31 L. Ed. 863, 8 S. Ct. 778. and *Trinsey v. Pagliaro,* D. C. Pa. 1964, 229 F. Supp. 647.

### Mr. Scheuneman's affidavit was uncontested

Mr. Scheunemann submitted an affidavit extensively detailing the facts of this case. Defendant did not refute those facts. "Affidavits in support of and in opposition to a motion for summary judgment "shall be made on personal knowledge and shall set forth such evidentiary facts as would be admissible in evidence." WIS. STAT. § 802.08(3). On summary judgment, the party submitting the affidavit need not submit sufficient evidence to conclusively demonstrate the admissibility of the evidence it relies on in the affidavit. *Gross*, 259 Wis. 2d 181, ¶31 (citing *Dean Med. Ctr. v. Frye*, 149 Wis. 2d 727, 734-35, 439 N.W.2d 633 (Ct. App. 1989)). That party need only make a prima facie showing that the evidence would be admissible at trial. *Id.* If admissibility is challenged, the court must then determine whether the evidence would be admissible at trial. *Id.*"[1] Mr. Scheunemann set forth an affidavit on personal knowledge that would be admissible as evidence at trial. ACE made no challenge, expect an inadmissible claim of counsel that this is a commercial debt for collection and not a consumer debt for collection. Counsel made other assertions about Mr. Scheunemann's affidavit, but produced no witness or evidence to refute those specific facts, and failed to make any specific objections, thereby leaving Plaintiff's affidavit entirely unrefuted. Mr. Scheunemann's affidavit testifying to the "consumer nature" of the debt for collection under 15 § U.S.C. 1692 (a), overrides opposing counsel's inadmissible "commercial" conjecture.

### Mr. Berardi's affidavit is inadmissible

---

[1] *Palisades Collection LLC vs. Kalal*, paragraph #10 of 2/4/10 Wisconsin District IV Court of Appeals published decision. Full copy attached.

The only affidavit on record from Defendant is Mr. Berardi's, corporate legal counsel for ACE. The only issue raised in his affidavit, opposing Mr. Scheunemann's affidavit is the assertion the U.S. Bank account for collection against Mr. Scheunemann, by ACE, was "commercial" and Mr. Berardi submitted an unsigned U.S. Bank cardholder agreement allegedly governing the debt ACE was attempting to collect. His affidavit is attempting to claim firsthand knowledge of the U.S. Bank cardholder agreement between Kevin Scheunemann and U.S. Bank. His affidavit does not meet the business record exception to hearsay requirement.

1.) Mr. Berardi is not an employee of U.S. Bank.
2.) Mr. Berardi did not testify he was a custodian of records for U.S.Bank.
3.) Mr. Berardi did not testify the purported "commercial" U.S. Bank agreement was prepared, "at or near the time [of the event] by, or from information transmitted by, a person with knowledge" and "in the course of a regularly conducted activity." See Wis. Stat. § 908.03 (6).
4.) Mr. Berardi did not testify and is incapable of being a *qualified custodian* of U.S. Bank records under the ***Palisades vs. Kalal*** standard.[2]

Since Mr. Berardi's affidavit fails basic law school 101 business records exception for hearsay requirements, this court cannot consider any notion that this debt was "commercial" in nature. The only evidence before the court is Mr.Scheunemann's unrefuted affidavit that the *transactions* of the U.S. Bank account for collection, by ACE, were consumer. Since the underlying debt at issue for collection in this case was, indeed, a consumer debt, the remaining FDCPA, WCA, and DTPA violative behavior of ACE is undisputed by Mr. Scheunemann's affidavit, the court must find for the Plaintiff on the partial summary judgment motion.

## Conclusion

This court cannot accept unsubstantiated conjecture about the nature of the debt for collection in this case. It is undisputed: It was a consumer debt. Even if the

---

[2] The idea that ACE had this alleged cardholder agreement, *at the time the collection behavior occurred*, is amusing because Mr. Scheunemann made the demand for this alleged document in his 3/22/09 letter to ACE (Plaintiff Summary Judgment Exhibit #3). ACE, coincidently, did not produce this document, despite Mr. Scheunemann's 12-month old document demands, until ACE submitted a "judgment on the pleadings" motion to this court this year.

underlying debt for collection was not a consumer debt, the court must find for the Plaintiff on the Wisconsin Deceptive Trade Practice Act (DTPA) count. The DTPA applies to both *consumer and commercial* representations. Plaintiff has made a prima facie case for Summary Judgment.

Respectfully submitted,

Dated in Washington County, Wisconsin this 31st day of May 2010.

By: _____

Kevin Scheunemann
210 Dream Catcher
Kewaskum, WI 53040
262-339-5425
kewaskumdq@verizon.net

## Certificate of service

I, Kevin Scheunemann, certify that ___6/1/___, 2010, I mailed a true and correct copy of the above summary judgment reply to:

Kevin Scheunemann

Please send a copy of all notices and correspondence to:

Kevin Scheunemann
210 Dream Catcher Dr.
Kewaskum, WI 53040





Return to wisbar.org Wisconsin Court of Appeals

2010 WI App 38

**PUBLISHED OPINION**

**COURT OF APPEALS**

**DECISION**

**DATED AND FILED**

**February 4, 2010**

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.    2009AP482**
**STATE OF WISCONSIN**

**Cir. Ct. No. 2007CV748**
**IN COURT OF APPEALS**
**DISTRICT IV**

**PALISADES COLLECTION LLC,**

**PLAINTIFF-RESPONDENT,**

**V.**

**JACKIE C. KALAL AND RALPH A. KALAL,**

**DEFENDANTS-APPELLANTS.**

Case 2:09-cv-01134-CNC   Filed 06/02/10   Page 5 of 15   Document 16

APPEAL from a judgment of the circuit court for Dane County: MARYANN SUMI, Judge. *Reversed and cause remanded.*

Before Dykman, P.J., Vergeront and Higginbotham, JJ.

¶1 VERGERONT, J. Jackie and Ralph Kalal appeal the circuit court's judgment that they owe Palisades Collection LLC $27,343.47, plus costs, for the balance due on Jackie Kalal's credit card account with Chase Manhattan Bank. The Kalals contend the circuit court erred in granting summary judgment in favor of Palisades because the affidavit Palisades filed in support of its motion does not show the requisite personal knowledge to establish the admissibility of the attached account statements under the hearsay exception for records of regularly conducted activity. WIS. STAT. § 908.03(6) (2007-08).[1] We agree. We conclude the affidavit does not establish a prima facie case for summary judgment because it does not show that the affiant is a witness qualified, based on personal knowledge, to testify to the elements required for admissibility of the account statements under that exception. Accordingly, we reverse the summary judgment and remand for further proceedings.

¶2 Our reversal on this ground makes it unnecessary to rule on the Kalals' contention that the affidavit also fails to establish a prima facie case that there was a valid assignment of the debt by Chase to Palisades.

## BACKGROUND

¶3 Palisades filed a complaint alleging that Jackie Kalal opened a credit card account with Chase and, despite demand, she had failed to make payments on the balance due of $27,343.47. The complaint alleged that Palisades was the current holder of the credit card account. The answer denied the allegations. Ralph Kalal, Jackie's husband, successfully moved to intervene as a co-defendant in the case.

¶4 In support of its motion for summary judgment, Palisades submitted the affidavit of Marie Oliphant, who averred she was "a duly authorized representative of [Palisades], the owner of this account through purchase." In addition, Oliphant averred that the attached documents were "a true and correct copy of the credit card statements that were mailed to Jackie C. Kalal on a monthly basis." Each of the attached five pages is entitled "Chase Mastercard Account Summary," identifies Jackie Kalal as the cardholder, and states amounts due for the time periods identified. Oliphant averred that "there remains a balance outstanding as of February 26, 2007, in the amount of $27,343.47, plus costs and disbursements."

¶5 With respect to the attached account statements, Oliphant further averred:

[I]n my capacity as authorized representative, I have control over and access to records regarding the account of the above referenced Defendant(s), further, the original owner maintained records pertaining to its business; that the records were prepared in the ordinary course of business, at or near the time of the transaction or event, by a person with knowledge of the event or transaction, that such records are kept in the ordinary course of the original creditor's business and that of the Plaintiff; and that based upon my review of the business records of the original creditor, I have personally inspected said account and statements regarding the balance due on said account.

¶6 The Kalals opposed the motion, although they did not submit any affidavits or other factual materials. They contended that, with respect to the amount owed, the affidavit did not meet the requirements that it be "made on personal knowledge" and set forth "evidentiary facts as would be admissible in evidence." WIS. STAT. § 802.08(3). Specifically, the Kalals asserted that the affidavit did not show that Oliphant had personal knowledge of the amount owed and the attached documents were inadmissible to show that amount because the affidavit did not establish the foundation requirements of WIS. STAT. § 908.03(6), the hearsay exception for records of regularly conducted activity. They also asserted that, with respect to Palisades' ownership of the accounts, the affidavit contained only a legal conclusion and not evidence to support the conclusion that would be admissible at trial.

¶7 The circuit court rejected the Kalals' arguments. It concluded that Oliphant's affidavit was based on personal knowledge and the documents attached came within the hearsay exception.[2] The court also concluded that Oliphant's affidavit established a prima facie case for Palisades' claim and, because the Kalals had submitted no affidavit or other factual material to dispute her affidavit, they had not shown there was a factual dispute that entitled them to a trial.

## DISCUSSION

¶8 On appeal the Kalal's renew their arguments that Oliphant's affidavit does not establish a prima facie case for Palisades because of the lack of a foundation to bring the attached account statements within the hearsay exception in WIS. STAT. § 908.03(6) and because the statement that Palisades owns the account is an inadmissible legal conclusion. Because we agree with the Kalals on the first issue, it is unnecessary to address the second.

¶9 We review de novo the grant of summary judgment, employing the same methodology as the circuit court. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 314-16, 401 N.W.2d 816 (1987). A party is entitled to summary judgment when there are no genuine issues of material fact and that party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2). We examine the moving party's submissions to determine whether they constitute a prima facie case for summary judgment. *Gross v. Woodman's Food Market, Inc.*, 2002 WI App 295, ¶30, 259 Wis. 2d 181, 655 N.W.2d 718. If they do, then we examine the opposing party's submissions to determine whether there are material facts in dispute that entitle the opposing party to a trial. *Id.*

¶10 Affidavits in support of and in opposition to a motion for summary judgment "shall be made on personal knowledge and shall set forth such evidentiary facts as would be admissible in evidence." WIS. STAT. § 802.08(3). On summary judgment, the party submitting the affidavit need not submit sufficient evidence to conclusively demonstrate the admissibility of the evidence it relies on in the affidavit. *Gross*, 259 Wis. 2d 181, ¶31 (citing *Dean Med. Ctr. v. Frye*, 149 Wis. 2d 727, 734-35, 439 N.W.2d 633 (Ct. App. 1989)). That party need only make a prima facie showing that the evidence would be admissible at trial. *Id.* If admissibility is challenged, the court must then determine whether the evidence would be admissible at trial. *Id.*

¶11 In this case, the issue is whether Oliphant's affidavit makes a prima facie case that the attached account summaries are admissible under the hearsay exception in WIS. STAT. § 908.03(6) for records of regularly conducted activity.[3] To come within this exception, the record must be:

[a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, all in the course of a regularly conducted activity, as shown by the testimony of the custodian or other qualified witness .

§ 908.03(6).

¶12 The parties debate our standard of review on this particular issue, with the Kalals arguing that it is de novo and Palisades arguing that the circuit court's decision on this point was within it's discretion. If a circuit court's decision is discretionary, we employ a more deferential standard of review, upholding the decision if the court examined the relevant facts, applied a proper legal standard, and reached a reasonable conclusion using a rational process. ***Martindale v. Ripp***, 2001 WI 113, ¶28, 246 Wis. 2d 67, 629 N.W.2d 698.

¶13 Although it is well established that we employ the summary judgment methodology de novo, there may be a different standard of review for decisions on whether an affidavit meets the requirements that it is "made on personal knowledge and set[s] forth such evidentiary facts as would be admissible in evidence." WIS. STAT. § 802.08(3). These decisions may involve evidentiary rulings that are committed to the circuit court's discretion. ***Gross***, 259 Wis. 2d 181, ¶32. In other words, the circuit court, in deciding if an affidavit "is made on personal knowledge and sets forth such facts as would be admissible in evidence," is undertaking essentially the same analysis that it would undertake at trial to decide whether the affiant, now witness, testifying exactly as averred in the affidavit, is presenting admissible evidence. For example, in ***Gross*** we reviewed as discretionary the circuit court's decisions that an affidavit presented an adequate foundation that the affiant had the knowledge and experience to give an expert opinion on a particular topic, had personal knowledge on another topic, and adequately explained an attached chart so as to make the chart admissible in evidence. ***Gross***, 259 Wis. 2d 181, ¶¶36-38. *See* WIS. STAT. §§ 907.02 and 906.02.[4] Palisades relies on ***Gross*** in arguing that we should defer to the circuit court's decision here as an exercise of discretion.

¶14 However, not all evidentiary rulings are discretionary. For example, if an evidentiary issue requires construction or application of a statute to a set of facts, a question of law is presented and our review is de novo. ***State v. Jensen***, 2007 WI App 256, ¶9, 306 Wis. 2d 572, 743 N.W.2d 468. The Kalals' position on our standard of review is that we need not defer to the circuit court because we are applying an evidentiary rule to the averments in the affidavit.[5]

¶15 We conclude it does not matter in this case whether we employ a de novo standard of review or the more deferential standard for review of discretionary decisions. Under no reasonable view of Oliphant's affidavit does it show that she is qualified to testify that (1) the records were made at or near the time by, or from information transmitted by, a person with knowledge; and (2) this was done in the course of a regularly conducted activity.

¶16 We addressed the term "or other qualified witness" as it applies to WIS. STAT. § 908.03(6) in ***Berg-Zimmer & Associates, Inc. v. Central Manufacturing Corp.***, 148 Wis. 2d 341, 434 N.W.2d 834 (Ct. App. 1988). We concluded there that the witness, a manager for a company that had paid a supplier, was not a qualified witness with respect to invoices and supporting documentation prepared by the supplier. *Id.* at 348-50. His testimony showed he had reviewed the invoices and supporting documentation, separated out certain charges, and totaled those. *Id.* at 350. We concluded this testimony was:

devoid of any evidence establishing [the witness's] qualifications to lay a proper foundation for the admissibility of [the supplier's] records. He did not possess knowledge to testify concerning the contemporaneousness of the entries, by whom they were transmitted or whether they were made in the course of a regularly conducted activity. *See* sec. 908.03(6), Stats. That he had possession of the records, understood their contents and recommended [his company's] payment, cannot bootstrap [him] into the position of a qualified witness under subs. (6).

*Berg-Zimmer*, 148 Wis. 2d at 350-51.

¶17 In *Berg-Zimmer* we contrasted that unqualified witness with the witness in *Town of Fifield v. State Farm Mutual Automobile Insurance Co.*, 120 Wis. 2d 227, 353 N.W.2d 788 (1984). In *Town of Fifield*, the town chairperson testified from a summary of invoices prepared by the town clerk "in the course of the clerk's usual function of receiving and recording charges made against the town." *Id.* at 229. In *Berg-Zimmer*, we pointed out that the town chairperson in *Town of Fifield* was qualified to testify that the record was made in the course of regularly conducted activity. *Berg-Zimmer*, 148 Wis. 2d at 351. In contrast, we said, there was no evidence that the witness in *Berg-Zimmer* "had personal knowledge about the [supplier's] documents. [He] was testifying about documents given to him by a third party." *Id.*

¶18 Another example of a witness qualified to testify for purposes of the WIS. STAT. § 908.03(6) exception is found in *City of Milwaukee v. Allied Smelting Corp.*, 117 Wis. 2d 377, 344 N.W.2d 523 (Ct. App. 1983), *overruled on other grounds by Just v. Land Reclamation, Ltd.*, 157 Wis. 2d 507, 456 N.W.2d 570 (1990). In *City of Milwaukee*, we held that sewer examination reports were admissible under § 908.03(6) where the supervisor of the crews who made the reports testified that the crews made the reports of their visual inspection of sewers as part of their regular responsibilities for the regular business of the municipal bureau. *City of Milwaukee*, 117 Wis. 2d at 391-92.

¶19 Palisades attempts to distinguish *Berg-Zimmer* by asserting that it concerned "an evaluative or unique document containing the observations and evaluations of a particular author," whereas the account statements here are "quintessential business records." Presumably Palisades is referring to the fact that the witness in *Berg-Zimmer* segregated and totaled certain charges on the invoices after reviewing the supporting documentation. However, this fact was not the basis for our analysis in *Berg-Zimmer*. The basis for our analysis was that the witness was not qualified to testify on how the invoices and supporting documentation were prepared.[6]

¶20 Palisades contends that Oliphant's averment that she is now the custodian is sufficient to establish that the account statements meet the elements of the exception. Palisades correctly points out that WIS. STAT. § 908.03(6) does not require that the "custodian or other qualified witness" be the original owner of the records. However, under the plain language of this exception, being a present custodian of the records is not sufficient. The language is "as shown by the testimony of the custodian *or other qualified* witness." The only reasonable reading of this language is that a testifying custodian must be *qualified* to testify that the records (1) were made at or near the time by, or from information transmitted by, a person with knowledge; and (2) that this was done in the course of a regularly conducted activity.

¶21 In order to be qualified to testify on these two points, Oliphant must have personal knowledge of how the account statements were prepared and that they were prepared in the ordinary course of Chase's business. *See Berg-Zimmer*, 148 Wis. 2d at 351 (witness unqualified because of absence of evidence that he had personal knowledge of how the documents were prepared). *See also* WIS. STAT. § 906.02 (prohibiting a witness from testifying on a matter unless there is sufficient evidence that the witness has personal knowledge of the matter).

¶22 It is true, as Palisades contends, that a custodian or other qualified witness does not need to be the author of the records or have personal knowledge of the events recorded in order to be qualified to testify to the requirements of WIS. STAT. § 908.03(6). However, the witness must have personal knowledge of how the records were made so that the witness is qualified to testify that they were made "at or near the time [of the event] by, or from information transmitted by, a person with knowledge" and "in the course of a regularly conducted activity." *See* WIS. STAT. § 908.03(6). *In re*

*Denslow*, 104 B.R. 761 (E.D. Virginia, 1989), on which Palisades relies, does not dispense with the requirement that a qualified witness must have personal knowledge of how the records were prepared. Rather, it rejects the argument that the party advocating admissibility under the federal rule counterpart to § 908.03(6) is required to produce the person who made the record. *Id.* at 764-65.

¶23 Turning to Oliphant's affidavit, we conclude it presents no facts that show she has personal knowledge of how the account statements were prepared and whether they were prepared in the ordinary course of Chase's business. The averment that she, as a representative of Palisades, now has control over the records of Jackie Kalal's accounts and has "personally inspected said account and statements regarding the balance due," does not reasonably imply that she has personal knowledge of how Chase prepared the account statements. The averment repeating the substance of WIS. STAT. § 908.03(6) does not suffice in the absence of an averment that she holds or has held a position from which one could reasonably infer that she has some basis for personal knowledge of how Chase prepared the accounts. Because the affidavit does not set forth facts that would make the account statements admissible in evidence, the averment in the affidavit on the balance due is not admissible. Nothing in the affidavit shows that Oliphant has personal knowledge of the amount owed if the account statements are inadmissible to prove the amount.

¶24 Palisades contends that the conclusory nature of Oliphant's averments is not a proper basis for objecting to their admissibility. Palisades relies on *Gross*, 259 Wis. 2d 181, ¶39, where we held that averments on injury to the affiant's business were statements of evidentiary fact based on personal knowledge and were admissible because they were "general statements of fact." However, the problem with Oliphant's averments regarding the account statements is not that they are *general* facts but that nothing in the affidavit reasonably implies that Oliphant has personal knowledge of these general facts.

¶25 Palisades also asserts that the Kalals have failed to show that Oliphant does not have knowledge of the way Chase keeps its records. However, as the moving party, Palisades must make a prima facie showing that the affidavit sets forth facts that would make the account statements admissible in evidence. *Gross*, 259 Wis. 2d 181, ¶31. It has not done so.

## CONCLUSION

¶26 We conclude Oliphant's affidavit does not establish a prima facie case for summary judgment because it does not show that she is a witness qualified, based on personal knowledge, to testify to the elements required for admissibility of the account statements under WIS. STAT. § 908.03(6). Accordingly we reverse the summary judgment and remand for further proceedings.

*By the Court.*--Judgment reversed and cause remanded.

Recommended for publication in the official reports.

---

[1] All references to the Wisconsin Statutes are to the 2007-08 version unless otherwise noted.

[2] The circuit court also concluded that the bank statements were self-authenticating documents, *see* WIS. STAT. § 909.02, but we do not address this aspect of the court's ruling because the Kalals do not challenge it on appeal.

[3] Palisades does not contend that the bank statements are not hearsay, implicitly conceding that they must therefore come within an exception to the hearsay rule in order to be admissible. Hearsay is "a

statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." WIS. STAT. § 908.01(3).

[4] WISCONSIN STAT. § 907.02 provides:

Testimony by experts. If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

WISCONSIN STAT. § 906.02 provides:

Lack of personal knowledge. A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness. This rule is subject to the provisions of s. 907.03 relating to opinion testimony by expert witnesses.

[5] The Kalals also argue that the circuit court did not exercise its discretion because it did not explain its reasoning. However, this in itself does not mean we cannot review a decision under the deferential standard for review of discretionary decisions. When a circuit court does not explain its reasoning, we may review the record to determine whether a court, applying the correct law to that record, could reasonably reach the same result. *See Randall v. Randall*, 2000 WI App 98, ¶7, 235 Wis. 2d 1, 612 N.W.2d 737.

[6] In support of its argument on "evaluative" documents, Palisades also cites to ***State v. Williams***, 2002 WI 58, ¶49, 253 Wis. 2d 99, 644 N.W.2d 919, in which the court concluded that crime lab reports do not come within the WIS. STAT. § 908.03(6) exception, drawing on the well-established rule that documents prepared in anticipation of litigation are not admissible under this exception. This case has no bearing on the issue before us.

---

© 2010, State Bar of Wisconsin
P.O. Box 7158, Madison WI 53707-7158. Customer service, (800) 728-7788.
For problems with this site, contact the webmaster.
Disclaimer of Liability | Terms & Condition of Use | Privacy Statement
WisBar.org

U.S. Bank National Association ND
P. O. Box 2066
Milwaukee, WI 53201-2066

Exhibit "T"

00002261

|..|.|..||..|.|.||....|.|.|..|..|.|..|.|.|..|.|..||...|..|.||

### U.S. Bank VISA Credit Cardmember Agreement

This is a cardmember agreement and disclosure statement ("Agreement") between you and U.S. Bank National Association ND containing the terms that will apply to your U.S. Bank Visa Credit Card Account ("Account") effective February 3, 2004. In this Agreement "you" and "your" means each individual accepting a solicitation or applying for the Account or otherwise agreeing to be responsible for the Account. "We", "us", "our" and "the Issuer" means U.S. Bank National Association ND, the issuer of the Card and your Account creditor. Please read this Agreement carefully and keep it in a safe place to make the best use of the credit cards we issue with this Account (the "Card") The Agreement becomes effective as soon as you or someone authorized by you (an "authorized signer") uses the Card or Account, but no later than 30 calendar days after we issue and you fail to return the Card

ACCOUNT FEATURES AND YOUR USE OF THE ACCOUNT

1 Personal Use - You may use the Account only for personal, family or household purposes. Federal or state consumer protection laws may not apply if you use the Account for other than personal, family, or household purposes. In addition, we may suspend or cancel your ability to use the Account or Card if they are used for other purposes.

2. Account Purchases - You may use the Account to buy, lease or otherwise obtain goods or services from participating merchants (including transactions you initiate by mail, telephone or over the Internet), or take advantage of special promotional Convenience Check or Balance Transfer offers that post as Purchase transactions ("Purchases"). We will, in connection with any promotional Balance Transfer or Convenience Check offer we make, provide you with materials that explain whether those transactions will post and be treated as a Purchase. Even if you have not signed a sales draft or the merchant has not supplied you with a written receipt or other proof of sale, you are responsible for all Purchases made through the Account except as expressly limited by applicable law (see "Your Billing Rights" section below for more details).

3. Account Advances - Advances are transactions other than Purchases that allow you direct access to funds available through your Account. Advances may include Account transactions such as cash advances you obtain directly from us, other participating financial institutions, or automated teller machines ("Cash Advances"), telephone transfers, some Balance Transfers, some Convenience Checks, FastCash, Overdraft Protection Advances and Cash Equivalent Advances. ("Cash Equivalent Advances" include transactions to acquire or initiate wire transfers, travelers checks, money orders, foreign cash transactions, casino gaming and betting transactions and lottery tickets. "Financial institution" or "ATM" advances include Phone (automated phone system), 24 Hour (customer service assisted) and Internet transfers.) Monthly Account statements we issue may refer to Advances as an "Advance", "Cash", "Cash Advances", or by the product or device you used to obtain an Advance. Refer to the Account Fees section for details on Advance Transaction Fees

4 Advance Limits - No more than 50% of the Credit Limit (defined below) is available for Cash Advances, Cash Equivalent Advances or Advances requested through telephone transfers. Unless we have elected in this Agreement or otherwise to limit the amount, number and/or availability of other Advances you may obtain through Overdraft Protection, Convenience Checks, and FastCash transactions, you may use the Account to obtain those Advances up to the amount available under the Credit Limit.

5 Convenience Checks - From time to time, we may supply Convenience Checks for use by the person(s) named on those checks. Convenience Checks are drafts that look like other checks, but are drawn on credit available in the Account. We may, based on the particular offers we make from time to time, provide Convenience Checks that will post and be treated as an Advance or Convenience Checks that will post and be treated as a Purchase. We will, in connection with any Convenience Check we provide, include materials that explain whether the Convenience Check will post and be treated as an Advance or as a Purchase. Convenience Checks must be written in U.S. dollars We may return a Convenience Check unpaid if:
(a) the credit available under your Credit Limit is less than the Convenience Check amount;
(b) the Account is in default, or
(c) the Convenience Check is improperly signed or otherwise fails to conform to our regularly accepted standards for check payment. Convenience Checks may not be used to pay the Account or any obligation you owe us or our affiliates.

6. Paying and Stopping Payment on Convenience Checks - You must use the number and address provided in the "Lost or Stolen Card or Convenience Check" section below to request that payment be stopped on a Convenience Check. You must call us promptly with an oral stop payment request and then provide us with a written confirmation of the stop payment request within 14 calendar days. Any stop payment request we receive will remain in effect for 6 months, unless you renew the request in writing before the end of that time. We may pay Convenience Checks more than 6 months old. There may be circumstances under which a Convenience Check must be paid, even if we have received a stop payment request from you. We will not be liable to you if we do not honor your stop payment request under those circumstances. If it is determined that a Convenience Check should have been paid, but was not, we will not be liable for any consequential, punitive or incidental damages if we acted in good faith. Our only obligation under those circumstances will be to pay the designated payee the amount of the Convenience Check and cancel any charges assessed against your Account as a result of any wrongful failure to honor the Convenience Check

7. Balance Transfers - We may permit you to transfer balances and obligations to the Account that you owe other companies or financial institutions, subject to the terms and conditions disclosed in offers we may make to you from time to time. Balance Transfers will post to the Account and be separately reflected on Monthly Account statements as Balance Transfer, or, depending upon the offer, may post to the Account and be treated as a Purchase, Cash Advance or some other kind of Advance transaction We will, in connection with any Balance Transfer offer we make, provide you with materials that explain how the Balance Transfer will post to the Account and be reflected on Monthly Account statements. You may not request Balance Transfers of existing obligations you owe us or our affiliates. If you request a Balance Transfer that would cause the Account to exceed its Credit Limit, we may, at our option, (a) post the entire Balance Transfer requested to your Account and assess an Overlimit Fee; (b) post only a portion of the Balance Transfer requested to your Account up to the amount of credit available under the Credit Limit; or (c) refuse to process the entire amount of the Balance Transfer requested.

8. Overdraft Protection - This section is part of the Agreement only if you have specifically requested and have obtained Overdraft Protection linking the Account with a designated checking account at a financial institution with which we are affiliated or with which we have a An Overdraft Protection Advance allows us to transfer Account funds and prevent overdrafts on the designated checking account. You authorize us to make Overdraft Protection Advances from the Account as provided in this Agreement. Any Overdraft Protection Advance will post and be treated as an Advance drawn on the Account. An Overdraft Protection Advance will be made only once per day, and will be made in multiples of $25 (regardless of the specific overdraft amount). We may cancel Overdraft Protection privileges under the Account, even if the Account remains open for other purposes. NOTE: Overdraft Protection Advances on correspondent accounts may not be in multiples of $25, will post as a "Financial Institution Advance", and will be subject to those fees. Please verify the amount of the Overdraft Protection Advance with your financial institution.

FINANCE CHARGES AND ACCOUNT FEES

9. Account FINANCE CHARGES - FINANCE CHARGES reflect the cost of credit. Your total FINANCE CHARGE for any billing cycle will equal the amount of any (a) periodic rate FINANCE CHARGES (sometimes referred to as "interest" here and on monthly Account statements); (b) Advance transaction fees; and (c) any other transaction fees that are considered FINANCE CHARGES. In some of the following sections, we have abbreviated the terms "daily periodic rate" as "DPR", "average daily balance" as "ADB"; and "annual percentage rate" as "APR".

10. Interest Rate -
(a) Variable Rate for "Purchases", Variable Rate for "Balance Transfers", and Variable Rate for "Cash Advances". The Daily Periodic Rate for transactions posting as Purchases, Advances and Balance Transfers is equal to 1/365th of its corresponding ANNUAL PERCENTAGE RATE. The standard Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE ("APR") for transactions posting to your Account as Purchases, Advances and Balance Transfers are variable rates that may change from time to time based on changes to a published Index.
Your Daily Periodic Rate and corresponding APR may increase or decrease from time to time according to the movements up or down of the Index, which is the highest Prime Rate published in the "Money Rates" section of the Midwest Edition of *The Wall Street Journal* on the last business day in each of the three most recent calendar months before the date on which the billing cycle closed (in other words, the "statement date"). Any variable rate adjustment based on an Index change will be effective as of

the first day of the billing cycle, and will apply to the new and outstanding Account balances and transactions subject to that variable rate. We reserve the right to choose a comparable new index if *The Wall Street Journal* ceases to publish a Prime Rate. The current Index value for the Account is 4.00%. To determine the standard rates for transactions posting to the Account as Purchases and Balance Transfers, we will add the Index to a Margin of 5.90%, (resulting in a standard Daily Periodic Rate of .02712328%, and a corresponding ANNUAL PERCENTAGE RATE of 9.90%.) To determine the standard rate for transactions posting as Advances, we will add the Index to a Margin of 14.99% (resulting in a Daily Periodic Rate of .05202739%, and a corresponding ANNUAL PERCENTAGE RATE of 18.99%). However, transactions posting as Advances are subject to a minimum Daily Periodic Rate of .05476712% (corresponding ANNUAL PERCENTAGE RATE of 19.99%) Currently, the standard ("DPR") for transactions posting as Advances is .05476712% (corresponding APR of 19.99%.) Any variable rate adjustment will be effective as of the first day of the billing cycle that begins after a change in the Index, and will apply to all new and outstanding Account balances subject to the variable rate. Any increase or decrease to the Index will result in an increase or decrease in the FINANCE CHARGE on the Account, an increase or decrease to your Minimum Payment, and an increase or decrease to your New Balance.

(b) Fixed Delinquency Rate. Upon the occurrence of an "Adjustment Event", each Daily Periodic Rate and corresponding APR in effect for new and outstanding Purchase Advance and Balance Transfer balances will increase from their standard rates or any introductory or promotional rates to a "Delinquency Rate". The Delinquency Rate will take effect and apply to new and outstanding Purchase, Advance and Balance Transfer balances as of the first day of the billing cycle in which the Adjustment Event occurs. An Adjustment Event occurs whenever a Minimum Payment is thirty (30) calendar days past due once, or whenever a Minimum Payment is five (5) calendar days past due twice during the same twelve (12) month period. An "Adjustment Event" for promotional rates occurs on the first date of delinquency. Your promotional rate will expire upon an Adjustment Event and will be changed to the Delinquency Rate. Each Delinquency Rate is a fixed rate that does not vary based on changes to a published Index. The Delinquency Rate that applies to Purchases and Balance Transfer balances will be a Daily Periodic Rate of .06572602% (corresponding ANNUAL PERCENTAGE RATE of 23.99%). The Delinquency Rate that applies to Advance balances will be a Daily Periodic Rate of .06572602% (corresponding ANNUAL PERCENTAGE RATE of 23.99%). The Delinquency Rate for all Account balances will remain in effect until the closing date of the 6th consecutive billing cycle that your Account is "current" (that is, no Minimum Payments past due) On the first day of the billing cycle following your 6th consecutive current cycle, the Daily Periodic Rate (and corresponding APR) for Purchase, Advance and Balance Transfer balances will decrease to their standard rates (not any introductory, promotional, or discounted rates). An increase to your Daily Periodic Rate will result in an increase in the FINANCE CHARGE on your Account, an increase to your Minimum Payment, and an increase to your New Balance

11. Interest FINANCE CHARGES: Method of Computing Amount Subject to Interest - We calculate the periodic rate or "interest" portion of the FINANCE CHARGE by multiplying the applicable daily periodic rate "DPR" by the Average Daily Balance (including new transactions) of the Purchase, Advance and Balance Transfer categories subject to interest ("Amounts Subject to Interest"), and then adding together the resulting interest from each category. We determine the Average Daily Balance ("ADB") separately for the Purchases, Advances and Balance Transfer categories.

To each category, we add together the daily balances in those categories for the billing cycle and divide the result by the number of days in the billing cycle. We determine the daily balances each day by taking the beginning balance of those Account categories (including any billed but unpaid interest, fees, credit insurance charges and other charges), adding any new interest, fees, and charges, and subtracting any payments or credits applied against your Account balances that day. We add a Purchase, Advance or Balance Transfer to the appropriate balances for those categories on the later of the transaction date or the first day of the statement period. Billed but unpaid interest on Purchases, Advances and Balance Transfers is added to the appropriate balances for those categories each month on the statement date. Billed but unpaid Advance transaction fees are added to the Cash balance of the Account on the date they are charged to the Account. Any billed but unpaid fees on Purchases, credit insurance charges, and other charges are added to the Purchase balance of the Account on the date they are charged to the Account. Billed but unpaid fees on Balance Transfers are added to the Balance Transfer balance of the Account on the date they are charged to the Account. In other words, billed and unpaid interest, fees, and charges will be included in the Average Daily Balance of the Account that accrues interest (the "Amount Subject to Interest") and will reduce the amount of credit available to you. Exception: Credit insurance charges are not included in the ADB calculation for Purchases until the first day of the billing cycle following the date the credit insurance premium is charged to the Account. There is a minimum FINANCE CHARGE of $2.00 in any billing cycle in which a FINANCE CHARGE is due.

12. Grace Period - You have a 20 to 25 day grace period for Purchases, (including any promotional Balance Transfers or Convenience Checks that will post as Purchases), provided you have paid your Previous Balance in full by the Payment Due Date shown on your monthly Account statement. In order to avoid additional FINANCE CHARGES on Purchases, you must pay your New Balance in full by the Payment Due Date shown on the front of your monthly Account statement. There is no grace period for transactions that post to the Account as Advances or Balance Transfers. Those transactions are subject to interest from the date they post to the Account until the date they are paid in full.

13. Introductory and Promotional Rates - We may, at our option, offer you for a limited time introductory or promotional interest rates for all or part of the Purchase, Advance, or Balance Transfer balances in the Account. We will tell you the introductory or promotional rate and the period of time during which it is in effect in the offer. Unless an offer states otherwise, an introductory or promotional rate will generally remain in effect until the last day of the billing cycle in which the introductory or promotional rate expires the date the Account is closed to future transactions, or the date your Account first becomes past due because a Minimum Payment is not received in full on or before its Payment Due Date, whichever occurs sooner (the "Termination Date") Any introductory or promotional rate that applies to new or outstanding Account balances will increase to the standard rate that would otherwise apply, or, when appropriate under the terms of this Agreement, a Delinquency Rate, if we do not receive at least the Minimum Payment due by the Payment Due Date shown on a monthly Account statement in any month.

14. Account Fees - You agree to pay the following Account fees and FINANCE CHARGES:

(a) We will add a FINANCE CHARGE to the Advance balance of the Account in the form of the Advance Transaction Fees disclosed below for each Advance you obtain during a billing cycle. The fees imposed will equal the greater of the fee based on a disclosed percentage of each Advance or the minimum dollar amount, with the maximum Advance Transaction Fee, shown below. All Advance Transaction FINANCE CHARGE fees listed below are in addition to the interest that accrues on Account Advances.

| CASH RECEIVED FROM | CASH FEE % | MINIMUM | MAXIMUM |
|---|---|---|---|
| FINANCIAL INSTITUTION | 4.000% | $5.00 | No Maximum |
| CASH EQUIVALENT | 4.000% | $10.00 | No Maximum |
| ATM | 4.000% | $5.00 | No Maximum |
| CONVENIENCE CHECK | 3.000% | $5.00 | No Maximum |
| OVERDRAFT PROTECTION | 3.000% | $5.00 | No Maximum |

We will add a Balance Transfer Fee FINANCE CHARGE to the Purchase balance of the Account equal to 3.000% of the balance transfer amount, subject to a minimum of $5.00 and a maximum of (No Maximum).

(b) In addition to interest, your Account may be subject to a FINANCE CHARGE in the form of a Promotional Discount Transaction Fee for each Promotional Discount you receive during the billing cycle, as outlined in any Promotional Discount offer we extend.

(c) Annual Membership Fee.

There is no Annual Membership Fee on your account.

(d) We will add a Late Payment Fee to the Purchase balance of the Account if your Minimum Payment is not received by the Payment Due Date shown on the monthly Account statement.

During any period of twelve consecutive months, the first 2 times your payment is late, a $29.00 Late Payment Fee will be assessed. Subsequent times your payment is late, the Late Payment Fee will be $38.00. The Late Payment Fee will be reduced to $29.00 when you have had two or fewer late payments in the prior period of twelve consecutive months.

(e) We will add an Overlimit Fee of $35.00 to the Purchase balance of the Account if you exceed your Credit Limit at any time during the billing cycle, even if this occurs because FINANCE CHARGES or other fees are assessed on the Account on any day on or before your statement cycle date. The Overlimit Fee disclosure will be determined by your state of residence. For KY, MI, OH, and TN, the fee will be disclosed as Overlimit Fee FINANCE CHARGE $35.00. For residents of any other state the fee will be disclosed as Overlimit Fee $35.00.

(f) We will add a Returned Payment Fee of $35.00 to the Purchase balance of the Account if any payment on the Account is not honored or if we must return it to you because it cannot be processed. A check that is returned unpaid will be sent for collection.

(g) We will add a Returned Convenience Check Fee of $35.00 to the Purchase balance of the Account if you write a Convenience Check that we do not honor under the terms of this Agreement. (See "Convenience Checks" and "Paying and Stopping Payment on Convenience Checks" sections above for more details.)

(h) We will add a Duplicate Documentation Fee of $5.00 to the Purchase balance of the Account for each copy of a monthly statement, sales slip, refund slip, or Advance slip that you request. There will be no charge for documentation requests made in connection with a billing error notice, if our investigation indicates a billing error occurred.

(i) We will add a Phone Pay Fee FINANCE CHARGE of $15.00 to the Purchase balance of the Account if you call us to make a payment on your Account and are assisted by a customer service representative to make the payment.

(j) We will add an Account Management Fee FINANCE CHARGE of $2.50 per month if you voluntarily close your Account with a balance. (Secured accounts are not subject to this fee).

IMPORTANT INFORMATION ABOUT USING YOUR ACCOUNT

15. Insurance Charges - Credit life insurance and disability insurance are not required to obtain credit. If you are eligible, you may participate in a group credit card insurance program, which we have arranged. If you elect insurance coverage, an insurance premium charge (at the rate disclosed to you) will be added to the Purchase balance as of the closing date of each billing cycle based upon the Account balance (including accrued FINANCE CHARGES). The terms of your insurance coverage will be summarized in the Certificate of Insurance, which will be provided to you.

16. Credit Limit - The Account Credit Limit is the maximum amount of credit available and that you may owe under the Account at any time. You may not request or obtain additional Purchases, Advances or Balance Transfers once you have reached your Credit Limit. The initial Credit Limit is shown on the Card carrier and will also appear on your monthly Account statements. We reserve the right to review your Account at any time and increase or decrease your Credit Limit. You may not increase your Credit Limit by carrying credit balances over the Credit Limit we make available to you. (Also see the "Advance Limits" section above for more information about limits on Cash Advance, Cash Equivalent Advance and telephone transfer transactions).

17 Payment - You must pay us in U.S. dollars with checks or similar payment instruments drawn on a financial institution located in the United States. We may, at our option, choose to make an exception and accept a payment drawn on a foreign bank. However, you will be charged and agree to pay any collection fees required in connection with such a transaction. The date you mail a payment is different than the date we receive that payment. For purposes of this Agreement, the payment date is the day we receive your check or money order at the address specified on your monthly Account statement. If you mail your payment without a payment coupon or to an incorrect address, it may result in a delayed credit to your Account. This may result in additional FINANCE CHARGES, fees, and possible suspension of your Account.

18 Minimum Monthly Payment - Each month, you must pay at least the Minimum Payment and any past due Minimum Payment(s) by the Payment Due Date shown on your monthly Account statement. You may, at your option, pay more than the Minimum Payment or pay the New Balance in full to reduce or avoid the Interest FINANCE CHARGE for the Account. The Minimum Payment is equal to any Annual Membership Fee due, plus the greater of $10.00 or 2.00% of your regular New Balance rounded to the next highest dollar or the full amount of any regular New Balance less than $10.00. Any Minimum Payment, or additional amount you pay each month will not prepay any

Case 2:09-cv-01134-CNC    Filed 06/02/10    Page 13 of 15    Document 16

future Minimum Payments required or change your obligation to make at least a Minimum Payment by the Payment Due Date.

19. Payment Application - We will apply payments to promotional or discounted interest rate Purchase, Advance and Balance Transfer balances before we apply payments to higher rate balances. If we cannot collect your check or other payment item within a reasonable period of time, we may post as an Advance transaction the full amount of any credit previously given and charge interest on this amount from the posting date of the transaction. After a payment has been made, the Issuer reserves the right to withhold available credit in the amount of the payment for 7 business days. Any credit available before the payment is made will continue to be available for use during this time.

20. Skip Payment Option - We may, at our option, occasionally offer you an opportunity to "skip" your obligation to make the Minimum Payment due. You may not skip payments unless we make this offer to you. You may skip up to two (2) payments in twelve (12) months without incurring a Late Payment Fee, but those two monthly payments may not be payments that are required in consecutive months. You cannot use a skip payment option if your Account is subject to a Delinquency Rate, is otherwise delinquent, or is in default. When you take advantage of a skip payment option we offer, the interest will continue to accrue on the entire unpaid balance of your Account.

21. Change of Address - Your monthly Account statements and notices about your Account will be sent to the address you provided in your application or your response to our Account solicitation. To change your address, you must call us at 1-800-285-8585, (FAX 1-701-461-4022, TDD 1-888-352-6455) or write to us at the following address: Cardmember Service, P.O. Box 6352, Fargo, ND 58125-6352. We must receive this information 15 days before the date a billing cycle closes to provide your Monthly Account statement at your new address. Note: If you have an address change within 45 days of the expiration date of your Card(s), please contact Customer Service at 1-800-285-8585, (FAX 1-701-461-4022 TDD 1-888-352-6455) with that information so your new Card(s) can be mailed to you new address.

22. Authorized Signers - You or any other Account obligor may ask us to issue a Card and otherwise give Account access to a person authorized to use the Account. This person is called an "authorized signer". You agree to be responsible for all Account transactions made by any such authorized signer. You agree not to give your Card to anyone else or allow anyone other than an authorized signer to use the Account. If you give your Card or Account number to someone other than an authorized signer, you will be liable for any charges made by that person, unless and except as expressly required by applicable law. You, as a primary or joint Cardmember and Account obligor, must call us at 1-800-285-8585, (FAX 1-701-461-4022, TDD 1-888-352-6455) or write us at Cardmember Service, P.O. Box 6352, Fargo, ND 58125-6352 with any request to cancel and remove the Account authority of an authorized signer or any other person given access to the Account.

23. Lost or Stolen Card or Convenience Checks - You must notify us immediately if your Card or Convenience Checks are lost or stolen or there is possible unauthorized use of your Card. You will not be liable for unauthorized use of the Account. You must notify U.S. Bank National Association ND by telephone at 1-800-285-8585, (FAX 1-701-461-4022 TDD 1-888-352-6455), or in writing at P.O. Box 6352, Fargo ND 58125-6352. If this happens, we will ask you and all other persons given Account access to return all Cards and unused Convenience Checks to our Investigation Department. In addition, we have the right to close your Account and open a new Account. If we do so, new Cards and Convenience Checks will be issued for your new Account.

24. Using Your Card in a Foreign Country -
For VISA Accounts - You may use your Credit Card for retail purchases at foreign (outside the United States) merchants and for cash withdrawals from foreign ATMs that bear either the PLUS System or VISA logos. If you use your card at an ATM that bears only the PLUS System logo (and no VISA logo), the charge will be processed through the PLUS System and will be converted into U.S. dollars at the exchange rate established, from time to time, by the operator of that ATM, plus one percent of the result. If you use your card at a merchant or an ATM that bears the VISA logo (and no PLUS System logo), the charge will be processed through the VISA system and will be converted into U.S. dollars according to the applicable bylaws and rules established by VISA from time to time. If you use your card at an ATM that bears both the VISA and PLUS System logos, the ATM operator will determine whether to send your transaction over the VISA or PLUS System network using such network's respective currency conversion rules then in effect. You understand that the exchange rate in effect when the charge is processed may differ from the rate in effect on the date of the transaction or posting to your account. The amount of your transaction in dollars if processed through VISA (under its current bylaws and rules) will be:
(a) The amount of the foreign currency times an exchange rate in effect one day prior to the processing date that is:
    i) the government mandated rate, if there is one, or
    ii) if there is no government mandated rate, the wholesale market rate; plus
(b) One percent (1%) times the resulting dollar amount; plus
(c) Our fee of 2% times the sum of subparagraphs (a) and (b).

YOUR LEGAL RESPONSIBILITY IN THIS AGREEMENT

25. Responsibility to Pay - You agree to pay us for all Purchases, Advances, Balance Transfers, FINANCE CHARGES, Account Fees and charges, any other transaction charges as provided in this Agreement and, to the extent permitted under applicable law, attorneys fees and collection costs we incur enforcing this Agreement against you. This is the case even if the Account is only used by one of you, or is used by an authorized signer chosen by only one of you. If there is more than one Account Holder each of you is responsible, together and separately, for the full amount owed on the Account.

26. Intent to Repay - Every time you use the Account, you represent to us that you intend and have the reasonable ability to repay your Account obligations. We rely on this representation every time you use the Account.

27. Settling a Disputed Balance - If you want to settle a disagreement

with us about any amount you owe by sending a check on which you have written "Payment in Full" or similar language, you must send us a written explanation of the disagreement or dispute and any such check to Cardmember Service, P.O. Box 6335, Fargo, ND 58125-6335. (See "Your Billing Rights" section below for complete details.) This address is different than the address you use to make Account payments. Writing "payment in full" or similar language on the check will not be enough to resolve the dispute. If we collect a check or any payment instrument marked "Paid in Full" that you sent to an address other than the one provided in this section (such as the address at which you normally make payments), we will not have waived our right to collect any remaining amount you owe us under the terms of the Account.

28. Default - You and the Account will be in default if:
a) you do not make the Minimum Payment by the Payment Due Date disclosed on the monthly Account statement;
b) you violate any other provision of this Agreement;
c) you die without a surviving Joint Account Holder;
d) you become insolvent, assign any property to your creditors, or go into bankruptcy or receivership;
e) you have made false statements affecting the application or maintenance of Account;
f) you go over Credit limit;
g) we have any reason to believe that the Account is in danger of, or is being used for fraud;
h) you are a married community property state resident and you or we receive a written termination notice of this Agreement from your spouse or
i) anything happens that we believe in good faith materially increases the risk that you will not live up to payment and other obligations under this Agreement.

29. Illegal Purchases - The Card must not be used for any unlawful purpose, such as funding any account that is set up to facilitate online gambling. You agree that you will not use or knowingly permit another to use the Card or Account for any transaction that is illegal under applicable law.

THE ISSUER'S LEGAL RIGHT TO CHANGE OR CANCEL THIS AGREEMENT

30. Ownership of this Account, Governing Law - Your Card and any other Account access devices that we supply to you are our property and must be immediately returned to us or our designated agent or otherwise destroyed or surrendered as we instruct. We extend all Account credit to you in and from the state of North Dakota, regardless of where you reside or use the Account. This agreement is governed by North Dakota law, and, to the extent necessary for interest exportation or consumer protection purposes, by federal law, regardless of the internal conflict of law principles of the state where you reside or use the Account. If a dispute arises and you file a lawsuit against us, service of process must be made on the Issuer at the following address: U.S. Bank National Association ND, 4325 17th Avenue SW, Fargo, ND 58103

31. Changes to the Account - We may change all or any part of this Agreement at any time when we notify you in writing. We will give you the notice of any such change in the manner required by North Dakota and federal law. The changed terms will apply to all new and outstanding Account balances and everything you owe under the Account as of the effective date indicated in the notice or otherwise permitted by applicable law. If you do not want to accept the changes, you must provide us with written notice at the address contained in the Change in Terms notice no later than 25 days after the effective date of the change. In this case, we will close your Account and permit you to pay off the outstanding Account balances in full at that time or under the terms of your existing Agreement. You will have accepted any proposed change if the Account is used after the effective date of the changed terms, even if 25 days has not elapsed after any such effective date.

32. Cancellation of your Account - We may cancel your Account or suspend your ability to obtain Account credit immediately, without notice, if the Account is in default. Even if you are not in default, we may cancel the Account by providing notice to you. You may cancel your Account by notifying us by telephone at 1-800-285-8585, (FAX 1-701-461-4022, TDD 1-888-352-6455) or in writing at Cardmember Service, P.O. Box 6352, Fargo ND 58125-6352. If you have a secured account, your termination request must be made in writing and mailed to PO Box 6363, Fargo ND 58125-6363, or faxed to 701-461-3410. If this is a Joint Account, we will honor a request by either of you to cancel the Account. After the Account is cancelled, you will not be able to obtain additional Account credit. After the Account is cancelled, the Account may continue to receive recurring charges for items such as business subscriptions until you contact and cancel delivery with the company providing the item. After the Account is cancelled, all amounts outstanding on the Account will be immediately due and payable without notice or demand from us. You must cut all Cards and Convenience Checks in half and return them to us. If you do not pay the amount you owe under this Agreement, you will be liable for our collection costs including our reasonable attorney fees and expenses of legal actions, to the extent permitted by applicable law.

33. Assignment of Your Account to Another Creditor - We may assign, sell or transfer your Account and amounts owed by you to another creditor at any time. If we do, this Agreement will still be in effect unless and until amended, and any references made in this Agreement to "we", "us", "our" or "the Issuer" will refer to the creditor to which we assigned, sold or transferred the Account or amounts owed under the Account. You may not delegate your obligations and responsibilities to us to any third party without our express written consent.

THE ISSUER'S LEGAL RIGHTS AND OBLIGATIONS

34. Collecting Credit Information About You - You authorize us to make any credit, employment and investigative inquiries we feel are appropriate related to giving you credit or collecting amounts owed on your Account. You agree that a consumer credit report may be requested periodically from one or more consumer reporting agencies (credit bureaus) and used in connection with your application and any update, renewal or extension of credit. We will provide information about you, your Account or your credit history to consumer reporting agencies and others who may properly receive that information.

35. Credit Bureau Disputes - If you believe we inaccurately reported credit history information about you or the Account to a credit bureau, call us at 1-800-481-9057 or write us at Consumer Recovery Department, U.S. Bank Disputes, P.O. Box 108, St.

Louis, MO 63166-9801

36. **Privacy Pledge and Disclosure of Account Information** - You will receive a copy of our Privacy Pledge when you open your Account and at least once annually while you remain our customer. We also keep copies of our Privacy Pledge in bank offices and post it on our web site. Our Privacy Pledge describes how we collect, protect and use your confidential financial and other information about you and the circumstances in which we might share information about you with members of our corporate family and with unaffiliated third parties. The Privacy Pledge also tells you how you can (a) limit the ways we share certain kinds of information about you and (b) request corrections to the information we maintain about you.

37. **Refusal to Honor Transactions** - The Issuer and its agents are not responsible if anyone refuses to honor your Card or a Convenience Check, or if authorization for a particular transaction is not given. Although you may have credit available under the Account, we may be unable to authorize credit for a particular transaction. The number of transactions you make in one day may be limited, and the limit per day may vary. These restrictions are for security reasons. And as a result, we cannot explain the details of how this system works. If your Account is over limit or delinquent, authorization of credit for transactions may be declined. We are not responsible for anything purchased with your Card or a Convenience Check, except as expressly required by applicable law (see "Your Billing Rights" section below for more details). You must return goods you purchased with the Card or Account to the Merchant and not to us.

38. **Third Party Offers** - From time to time, third parties may provide you with benefits not related to the extension of Account credit. We are not liable for these features, services and enhancements, as they are the sole responsibility of the third party provider. The Issuer and/or a third party may add, change or delete entirely these benefits without notice or liability to you, to the extent permitted by applicable law. You agree to hold us harmless from any claims, actions or damages resulting from your use of any of these features, services or enhancements, when permitted by applicable law.

39. **Telephone Monitoring** - From time to time, we may monitor telephone calls you make to us or our agents.

40. **Severability** - If a court of competent jurisdiction finds any part of this Agreement illegal or unenforceable, the remaining portions of the Agreement will remain in effect as written after any such illegal or unenforceable portion is amended in conformance with applicable law or, if necessary, voided.

41. **Entire Agreement** - This version of the Agreement replaces any previous versions of the Agreement. The Agreement, as modified by any change in terms we may deliver from time to time in accordance with applicable law, constitutes the entire agreement between you and us, and supersedes any prior negotiation or understanding between you and us concerning the subject matter of the Agreement.

42. **Waiver** - We do not give up our rights under the Agreement or applicable law when we fail to exercise or delay exercising those rights. Our failure or delay to exercise any right or remedy we have against you does not mean that we waive that right.

43. **Arbitration** - By requesting an Account from us and accepting this Agreement, you agree that if a dispute of any kind arises out of this Agreement, either you or we can choose to have that dispute resolved by binding arbitration. If arbitration is chosen by any party, neither you nor we will have the right to litigate that claim in court or to have a jury trial on that claim, or to engage in pre-arbitration discovery, except as provided for in the arbitration rules. In addition, you will not have the right to participate as a representative or member of any class of claimants pertaining to any claim subject to arbitration. The Arbitrater's decision will generally be final and binding. Other rights that you would have if you went to court may also not be available in arbitration. It is important that you read the entire Arbitration Provision carefully before accepting the terms of this Agreement.

Any claim, dispute or controversy (whether in contract, regulatory, tort, or otherwise, whether pre-existing, present or future and including constitutional, statutory, common law, intentional tort and equitable claims) arising from or relating to (a) the credit offered or provided to you, (b) the actions of you, us or third parties or (c) the validity of this arbitration provision (individually and collectively, a "Claim") must, after an election by you or us, be resolved by binding arbitration in accordance with this arbitration provision and the Commercial Arbitration Rules of the American Arbitration Association ("AAA") in effect when the Claim is filed (or, in the event this arbitrator or these arbitration rules are no longer available, then a comparable substitute arbitration procedure and/or arbitration organization that does business on a nationwide basis). There shall be no authority for any Claims to be arbitrated on a class action basis. An arbitration can only decide our or your Claim and may not consolidate or join the claims of other persons who may have similar claims. You may obtain rules and forms by calling the AAA at 800-778-7879. Any arbitration hearing that you attend will take place in the federal judicial district where you reside. At your request, we will advance the first $250 of the filing and hearing fees for any Claim you may file against us; the arbitrator will decide whether we or you will ultimately pay those fees. The arbitrator shall apply applicable substantive law consistent with the FAA and applicable statutes of limitations, and shall honor claims of privilege recognized at law. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. This Arbitration Provision shall survive repayment of your extension of credit and termination of your Account. This arbitration provision shall be governed by the Federal Arbitration Act, 9 U.S.C. Sections 1 through 16.

44. If you are an Executive Officer of U.S. Bancorp or any of its bank affiliates, the Bank reserves the right to demand payment at any time.

YOUR BILLING RIGHTS
KEEP THIS NOTICE FOR FUTURE USE
This is important information about your rights and our responsibilities under the Fair Credit Billing Act.

Notify Us in Case of Errors or Questions About Your Bill

If you think your bill is wrong or if you need more information about an item or transaction on your monthly billing statement, YOU MUST WRITE TO US ON A SEPARATE SHEET OF PAPER AND SEND IT TO:
    Cardmember Service
    P.O. Box 6335, Fargo, ND 58125-6335
Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill where the error or problem appeared. You can telephone us, but doing so will not preserve your legal rights under the Fair Credit Billing Act.

In your letter, include the following information:
1) Your name and Account number;
2) the dollar amount of the suspected error;
3) the date the transaction occurred (if possible); and
4) describe the error, and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your credit card bill automatically from your savings or checking account, you can stop the payment on any amount you believe is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

Your Rights and Our Responsibilities After We Receive Written Notice

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the statement was correct. After we receive your letter, we cannot try to collect any amount you questioned or report your Account as delinquent. We can continue to bill you for the amount you questioned, including Finance Charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your Account that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any Finance Charges related to the questioned amount. If we did not make a mistake, you may have to pay Finance Charges and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due. If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we cannot collect the first $50.00 of the questioned amount, even if your bill was correct.

Special Rules for Credit Card Purchases

If you have a problem with the quality of property or services that you purchased with your credit card, and you have tried in good faith to correct the problem with the Merchant, you may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right and both must apply:
1) You must have made the purchase in your home state or, if not within your home state within 100 miles of your current mailing address; and
2) The purchase price must have been more than $50.
The conditions do not apply if we own or operate the merchant or if we mailed you the advertisement for the property or services.
SPECIAL RULES FOR CREDIT CARD PURCHASES DO NOT APPLY TO PURCHASES MADE WITH CONVENIENCE CHECKS OR BALANCE TRANSFER CHECKS.

24 - 2114                                                             4719230653278108

Case 2:09-cv-01134-CNC    Filed 06/02/10    Page 15 of 15    Document 16